779 So.2d 735 (2001)
STATE ex rel. William OLIVIERI
v.
STATE of Louisiana.
State of Louisiana,
v.
Marvin Hutchinson.
Nos. 2000-KH-0172, 2000-KP-1767.
Supreme Court of Louisiana.
February 21, 2001.
*736 Robert S. Glass, John W. Reed, William Olivieri, Pro Se, Counsel for Applicant in No. 2000-KH-172.
Richard P. Ieyoub, Attorney General, Paul D. Connick, Jr., District Attorney, Terry B. Boudreaux, Counsel for Respondent in No. 2000-KH-172.
Chanel R. Debose, Packard E. Phillips, Counsel for Applicant in No. 2000-KP-1767.
Richard P. Ieyoub, Attorney General, Jon F. Rowley, District Attorney, Walker H. Drake, Jr., Counsel for Respondent in No. 2000-KP-1767.
KNOLL, Justice[*]
These two consolidated criminal cases raise the issue of whether the State may require sex offenders (either probationers or those released from incarceration on parole) to comply with notification provisions the Legislature enacted after they committed their offenses.[1] We granted these writ applications because there is a conflict among our courts of appeal on this issue and this Court has never addressed the question of whether retroactive application of these statutes, commonly referred to as Louisiana's Megan's Law,[2] violates the ex post facto clauses of *737 the federal and state constitutions. We find no ex post facto violation.

FACTS AND PROCEDURAL HISTORY
On May 9, 1990, William Olivieri ("Olivieri") pleaded guilty in Jefferson Parish to forcible rape of a woman who was thirty-six years of age, a violation of LA.REV.STAT. ANN. § 14:42.1. As a result of this guilty plea, the trial judge sentenced Olivieri to twenty years imprisonment at hard labor without benefit of parole, probation, or suspension of sentence for two years. In 1998 Olivieri, anticipating his scheduled good time release[3] in August 2000, filed a motion to be relieved of his duty to register as a sex offender, contending that the requirements of LA.REV.STAT. ANN. § 15:542, enacted after his crime, violate ex post facto principles. The district court denied Olivieri's motion, finding that he failed to present clear and convincing evidence as called for in LA.REV.STAT. ANN. § 15:544(B)[4] to show that he should be relieved from the registration and notification requirements of LA.REV.STAT. ANN. § 15:542. The Court of Appeal, Fifth Circuit, denied his writ application. State ex rel. William Olivieri v. State, 98-0759 (La. App. 5 Cir. 7/29/98). We granted Olivieri's writ application to this Court, State ex rel. William Olivieri v. State, XXXX-XXXX (La.9/5/00), 771 So.2d 78, and stayed enforcement of LA.REV.STAT. ANN. § 15:542 and 15:574.4(H), pending further orders of this Court, State ex rel. William Olivieri v. State, XXXX-XXXX (La.10/31/00), ___ So.2d ___. In early November 2000, Olivieri was granted good time release subject to supervision as though on parole.
On June 4, 1996, Marvin Hutchinson ("Hutchinson") pleaded guilty in St. Bernard Parish to oral sexual battery of a juvenile, a violation of LA.REV.STAT. ANN. § 14:43.3, which was committed in 1990. The district court sentenced Hutchinson to seven years imprisonment at hard labor, suspended, and placed him on five years active probation subject to special conditions, one of which was compliance with the notice requirements of LA.CODE CRIM. PROC. ANN. art. 895(H) added by 1992 La. Acts 962. The probation officer recommended that Hutchinson give notice of his crime to people within a three square block of his residence, publish his photograph in the local newspaper, provide notice and his photograph to the superintendent of the school district, as well as to the superintendent of the park, playground and recreation districts near his residence. On May 20, 1997, Hutchinson filed a motion in opposition to the recommendation of the probation officer that he comply with the notice requirements of LA.CODE CRIM. PROC. ANN. art. 895(H). The trial court denied his motion on May 22, 1997. On June 30, 1997, the trial court stayed the enforcement of its order of compliance with LA.CODE CRIM. PROC. ANN. art. 895(H). On April 14, 1998, Hutchinson also filed a *738 motion to correct an illegal sentence. This motion was denied on June 15, 1998. Hutchinson appealed both decisions of the trial court. The Court of Appeal, Fourth Circuit, affirmed the trial court,[5] finding that the provisions of LA.CODE CRIM. PROC. ANN. art. 895(H) are not violative of ex post facto principles because they are mere conditions upon which the defendant may be released on probation rather than the imposition of a separate penalty for failure to register as found in LA.REV.STAT. ANN. § 15:542. State v. Hutchinson, 99-0034, 99-0035 (La.App. 4 Cir. 5/17/00), 764 So.2d 1139. We granted Hutchinson's writ application to address the ex post facto question presented. State v. Hutchinson, XXXX-XXXX (La.8/31/00), 766 So.2d 1267.

LOUISIANA'S SEX OFFENDER REGISTRATION & NOTIFICATION STATUTES
Louisiana's Megan's Law is encompassed in three interrelated statutory provisions, LA.REV.STAT. ANN. § 15:542, LA. REV.STAT. ANN. § 15:574.4(H)(2), and LA. CODE CRIM. PROC. ANN. art. 895(H). Each basically[6] hinges its application on the commission of a sex offense which for the purposes of Louisiana's Megan's Law:
means conviction for the perpetration or attempted perpetration of any provision of R.S. 14:92(A)(7), of Subpart C of Part II, Subpart B of Par IV, or Subpart A(1) or A(4) of Part V, of Chapter 1 of Title 14 of the. Louisiana Revised Statutes of 1950, committed on or after June 18, 1992, or committed prior to June 18, 1992 if the person, as a result of the offense, is under the custody of the Department of Public Safety and Corrections on or after June 18, 1992. A conviction for any offense provided in this definition includes a conviction for the offense under the laws of another state which is equivalent to an offense provided for in this Chapter.
LA.REV.STAT. ANN. § 15:542(E).[7]

Defendants who plead guilty, convicted after trial, and defendants released from confinement: LA.REV.STAT. ANN. § 15:542
First, LA.REV.STAT. ANN. § 15:542, added by 1992 La. Acts 388, provides, in pertinent part, that "[a]ny adult residing in this state who has plead guilty or has been convicted of any sex offense shall register with the sheriff of the person's residence." LA.REV.STAT. ANN. § 15:542(A).[8] The registrant *739 must inform the officials of "his name, address, and place of employment; the crime for which he was convicted; the date and place of such conviction; any aliases used by the person; and the person's social security number." LA.REV. STAT. ANN. § 15:542(B). Such registration must occur within twenty-one days of establishing residence in this state or thirty days after release from prison, whichever is later. Id. This statute further provides the community notification requirements.[9] A person convicted of a sex offense must "[g]ive notice of the crime for which he was convicted, his name, and address to: (a) At least one person in every residence or business within a one mile radius in a rural area and a three square block area in an urban or suburban area of the address where the defendant will reside upon release." LA.REV.STAT. ANN. § 15:542(B)(1)(a). The offender must also "notify the principal of every school located within a one-mile radius...." LA.REV. STAT. ANN. § 15:542(B)(1)(b). Moreover, the offender must notify "[t]he lessor, landlord, or owner of the residence or the property on which he resides." LA.REV. STAT. ANN. § 15:542(B)(1)(c). Publication must be by mail and in the official journal "on two separate days, ... without cost to the state;" the notice provided in the official journal "shall also include a recent photograph of the offender, or a clear photocopy of a recent photograph of the offender." LA.REV.STAT. ANN. § 15:542(B)(2)(a). The court in which a sex offender was convicted may also require the offender to "give any other notice deemed appropriate ... including but not limited to signs, handbills, bumper stickers, or clothing labeled to that effect." LA.REV.STAT. ANN. § 15:542(B)(3). A person who fails to register as required by this statute "shall, upon first conviction, be fined not more than one thousand dollars or imprisoned for not more than one year, or both." LA.REV.STAT. ANN. § 15:542(F)(1); a second or subsequent conviction for failure to register "shall be sentenced to imprisonment for not more than three years without benefit of parole, probation, or suspension of sentence." LA. REV.STAT. ANN. § 15:542(F)(2).[10]

Defendants placed on probation: LA. CODE CRIM. PROC. ANN. art. 895(H)
Second, LA.CODE CRIM. PROC. ANN. art. 895(H), added by 1992 La. Acts 962, requires district court judges who place defendants on probation for sex offenses[11] to condition probation on the defendant giving notice similar to that required in LA. REV.STAT. ANN. § 15:542.[12] In addition, a *740 sex offender "who is the parent, stepparent, or has legal custody and physical custody of the child who is the victim," shall pay for the victim's psychological counseling "to ease the psychological impact upon the child" of the notice requirements to the community. LA.CODE CRIM. PROC. ANN. art. 895(H)(4).[13] Similarly, a person convicted of an offense involving criminal sexual activity must, at his cost, "successfully complete a sex offender treatment program." LA.CODE CRIM. PROC. ANN. art. 895(J).[14]

Parolees: LA.REV.STAT. ANN. § 15:574.4(H)(2)
Finally, LA.REV.STAT. ANN. § 15:574.4(H)(2), also added by 1992 La. Acts 962, makes it mandatory for the Board of Parole to impose special conditions of parole relating to community notice on the early release of sex offenders from the penitentiary.[15] If the victim was under eighteen years of age at the time of the commission of the offense, the Board must condition parole on the defendant giving notice similar to that required in LA.REV.STAT. ANN. § 15:542.[16] In addition, a sex offender "who is the parent, stepparent, or has legal custody and physical custody of the child who is the victim," shall not be paroled unless the victim has undergone psychological counseling prior to the offender's release "to ease the psychological impact upon the child" of the notice requirements to the community.[17] Like the probation provisions, the parolee shall pay the cost of this psychological counseling. LA.REV.STAT. ANN. § 15:574.4(H)(5).

LOUISIANA'S INTERPRETATION OF MEGAN'S LAW
Louisiana's appellate courts have split on the issue of whether courts and penal authorities may enforce these statutes retroactively. First, Louisiana's appellate courts, without much elaboration, have disapproved of retroactive application of LA. REV.STAT. ANN. § 15:542. See State v. Bishop, 96-694 (La.App. 5 Cir.12/30/96), 686 So.2d 1053, 1055 (holding that retroactive application of the statute "violates the constitutional *741 prohibition on ex post facto application of laws."); State v. Calhoun, 94-2568 (La.App. 1 Cir.2/23/96), 669 So.2d 1359, 1363 (holding that the statute's requirement that the application of the registration and notification to offenders who committed their crimes before enactment of the statute "would be violative of the ex post facto provisions in the United States and Louisiana Constitutions."); State v. Linson, 94-0061 (La.App. 1 Cir. 4/7/95), 654 So.2d 440, 446 (holding that because the notification "provisions were not in effect when defendant committed the instant offense," the court "vacate[s] those conditions."); Lee v. State, 96-0108 (La. App. 1 Cir.9/27/96), 681 So.2d 1020, 1022-23, writ denied, 97-1016 (La.4/25/97), 692 So.2d 1099 (holding that the Department of Public Safety and Corrections may not require registration under LA.REV.STAT. ANN. § 15:542 of offenders who committed crimes before enactment of the statute); State v. Payne, 633 So.2d 701, 702 (La. App. 1 Cir.1993), writ denied, 94-0291 (La.6/3/94), 637 So.2d 497 (holding that "requiring this defendant to register pursuant to Revised Statutes 540-549 is an unconstitutional violation of the ex post facto provisions in the United States and Louisiana Constitutions.").
On the other hand, Louisiana's appellate courts have split on whether the notice provisions of LA.CODE CRIM. PROC. ANN. art. 895(H), those who are placed on probation, may be applied retroactively. The Fourth Circuit's decision in Hutchinson, one of the cases presently before us, holds that the retroactive "application ... of the notice provisions of LA.CODE CRIM. PROC. ANN. art. 895(H) does not violate the ex post facto prohibitions of the United States and Louisiana Constitutions." Hutchinson, 764 So.2d at 1142. Other reported appellate decisions, however, have reached the opposite conclusion. See Linson, 654 So.2d at 446 (holding that because the notice "provisions were not in effect when defendant committed the instant offenses," the court "vacate[s]" those "conditions."); State v. Babin, 93-1361 (La.App. 1 Cir. 5/20/94), 637 So.2d 814, 824 (holding that "[b]ecause the provisions of article 895 H were not in effect at the time of the commission of defendant's crime, their application to defendant would be [a] ... violation of the ex post facto provisions in the U.S. and Louisiana Constitutions."); Payne, 633 So.2d at 702 (holding retroactive compliance with either R.S. 15:542 or La.C.Cr.P. art. 895(H) is a violation of the ex post facto provisions of the constitution).
In stark contrast, the appellate courts unanimously agree that LA.REV.STAT. ANN. § 15:574.4(H), those who are paroled, may be applied retroactively. See Lee v. State, 681 So.2d at 1022-23 (holding that "unlike La.R.S. 15:542, La.R.S. 15:574.4 does not create a new offense for a sex offender's failure to comply;" accordingly, retroactive application is permissible); State v. Sorrell, 656 So.2d at 1045-48 (holding that because "[t]he law in effect at the time of a prisoner's release governs the terms of that release," ex post facto application is permissible).

EX POST FACTO JURISPRUDENCE
Both Olivieri and Hutchinson contend that application of Louisiana's Megan's Law to their particular cases violates the ex post facto provisions of both the United States and Louisiana Constitutions.
In State ex rel. Glover v. State, 93-2330 (La.9/5/95), 660 So.2d 1189, 1201 and State v. Loyd, 96-1805 (La.2/13/97), 689 So.2d 1321, 1326, this Court recognized that Collins v. Youngblood, 497 U.S. 37, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990) overruled Kring v. Missouri, 107 U.S. 221, 2 S.Ct. 443, 27 L.Ed. 506 (1883) and Thompson v. Utah, 170 U.S. 343, 18 S.Ct. 620, 42 L.Ed. 1061 (1898), concluding that those cases "which had broadened the scope of the definition of an ex post facto law, were not `consistent with the term "ex post facto" at the time the Constitution was adopted.'" Collins, 497 U.S. at 47, 110 S.Ct. 2715.
*742 Although we recognized in Glover and Loyd that the recent Supreme Court cases narrowed the focus of ex post facto consideration, we did not reach the question of whether Louisiana's ex post facto jurisprudence should likewise be changed. Because of the posture of the two cases before us, we must reach the question we averted in Glover and Loyd. Thus, we must compare and contrast the treatment of ex post facto in federal and Louisiana state courts.

Federal Ex Post Facto
Article I, § 10 of the United States Constitution forbids states from passing any ex post facto law.[18] Although the language of the federal constitution does not define the term, the seminal case of Calder v. Bull, 3 U.S. (3 Dall.) 386, 390, 1 L.Ed. 648 (1798) interpreted that term and that holding has been applied ever since. The Calder Court outlined four categories of ex post facto laws: (1) a law making criminal, and subject to punishment, an activity which was innocent when originally done; (2) a law aggravating a crime or making it a greater crime than it was when originally committed; (3) a law aggravating a crime's punishment; and (4) a law altering the rules of evidence to require less or different testimony than was required at the time of the commission of the crime so as to make easier the conviction of the offender. Id. at 390.[19]
In Weaver v. Graham, 450 U.S. 24, 28-29, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981), the Supreme Court recognized two purposes which form the basis for the prohibition against ex post facto legislation. First, the prohibition assures "that legislative acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed." Id. Secondly, it "restricts government power by restraining arbitrary and potentially vindictive legislation." Id.; see also Landgraf v. USI Film Prods., 511 U.S. 244, 265, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994).
Prior to the United States Supreme Court's decision in Collins, 497 U.S. 37, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990), the Court had provided that a change which injuriously affects a substantial right to which the accused was entitled at the time of his offense is an ex post facto violation if applied retroactively. See Beazell v. Ohio, 269 U.S. 167, 46 S.Ct. 68, 70 L.Ed. 216 (1925) (holding that the former law afforded jointly indicted defendants separate trials as a matter of right, but the new law only afforded separate trials subject to the trial judge's discretion; held, no ex post facto violation because the law did not affect a substantial right of the accused); Kring, 107 U.S. 221, 2 S.Ct. 443, 27 L.Ed. 506 (1883) (holding that a law in effect at the time of the offense provided that on a charge of first-degree murder a guilty plea of second-degree murder acquitted the defendant of first-degree murder even if the plea was later set aside; a law passed after the offense was committed provided that if plea to second-degree murder is set aside, defendant may be tried for first-degree murder; held, the ex post facto change deprived the defendant of a substantial right).
In 1990, the United States Supreme Court held in Collins that the retroactive application of a statute allowing the appellate courts to reform an unauthorized verdict without remanding the case for a new trial was not violative of the ex post facto clause. At that time, the Court overruled Kring, supra, and Thompson, 170 U.S. at 351, 18 S.Ct. 620 (1898) (a case which held *743 that a change in Utah law which reduced the size of criminal juries from twelve to eight persons deprived the defendant of a substantial right involved in his liberty and violated the ex post facto clause, stating that the test is whether the retroactive application "alters the situation to [the defendant's] disadvantage."). In reaching this conclusion, the Court concluded that cases such as these, which had broadened the scope of the definition of ex post facto law, were inconsistent with the term "ex post facto law" as it was understood at the time the Constitution was adopted.
After the Collins decision, a statute which involves the first three Calder categories passes ex post facto examination if it:
[D]oes not punish as a crime an act previously committed, which was innocent when done; nor make more burdensome the punishment for a crime, after its commission; nor deprive one charged with crime any defense available according to law at the time the act was committed.
Id. at 2721.[20]
In California Dept. of Corrections v. Morales, 514 U.S. 499, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995), the Supreme Court followed Collins, and further explained:
Our opinions in Lindsey, Weaver, and Miller suggested that enhancements to the measure of criminal punishment fall within the ex post facto prohibition because they operate to the "disadvantage" of covered offenders. See Lindsey v. Washington, 301 U.S. 397, 401, 57 S.Ct. 797, 81 L.Ed. 1182 (1937); Weaver v. Graham, 450 U.S. 24, 29, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981); Miller v. Florida, 482 U.S. 423, 433, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987). But that language was unnecessary to the results of those cases and is inconsistent with the framework developed in Collins v. Youngblood, 497 U.S. 37, 41, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990). After Collins, the focus of the ex post facto inquiry is not whether a legislative change produces some ambiguous sort of "disadvantage," nor, as the dissent seems to suggest, on whether an amendment affects a prisoner's "opportunity to take advantage of provisions for early release,"... but on whether any such change alters the definition of criminal conduct or increases the penalty by which the crime is punishable.
Morales, 514 U.S. at 506, 115 S.Ct. 1597.
This review clearly indicates that the Collins/Morales line of jurisprudence established a return to Calder and shows that the operative factor in determining whether a law falls within the ambit of the ex post facto clause is whether the law can be considered "punishment" or altered the definition of criminal conduct. See also Carmell v. Texas, 529 U.S. at 522 (holding that it was a mistake in Kring and Thompson to stray beyond Calder's four categories).

Louisiana's Ex Post Facto Law
LA. CONST. art. I, § 23 prohibits the enactment of any ex post facto law.[21]
Traditionally, Louisiana jurisprudence has addressed this issue by making a determination of whether a law passed after the commission of an offense which in relation to that offense or its punishment altered the situation of a party to his disadvantage. Under such an inquiry, suspect legislation qualified as an ex post facto law if: (1) it was passed after the date of the offense; (2) it related to the offense or its punishment; and (3) the legislation altered the situation of the accused to his disadvantage. *744 See, State ex rel. Glover, 660 So.2d at 1200; Police Ass'n of New Orleans v. New Orleans, 94-1078 (La.1/17/95), 649 So.2d 951, 966 (holding that under LA. CONST. art. I, § 23, an "ex post facto law is one passed after the commission of an offense which in relation to that offense or its consequences alters the situation of a party to its disadvantage."); State ex rel. Turner v. Maggio, 463 So.2d 1304, 1307 (La.1985) ("Ex post facto changes in the substance of a criminal penalty cannot work to the disadvantage of the accused."); State ex rel. Bickman v. Dees, 367 So.2d 283, 291 (La.1978) ("Any law passed after the commission of an offense which ... alters the situation of a party to his disadvantage is an ex post facto law."); State v. Sepulvado, 342 So.2d 630, 635 (La.1977) ("An ex post facto law... is one passed after the ... commission of an act, which retroactively changes the legal consequences of such fact."); State v. Ferrie, 243 La. 416, 144 So.2d 380, 382 (1962) ("An ex post facto law [is] one enacted after the offense has been committed and which in relation to it or its consequences alters the situation of the accused to his disadvantage.")
After viewing this jurisprudence, it is clear that in ex post facto analysis Louisiana courts have broadly focused on whether a law has disadvantaged an accused rather than determining the narrower question of "whether any such change alters the definition of criminal conduct or increases the penalty by which the crime is punishable." Collins, 497 U.S. at 41, 110 S.Ct. 2715. We must now determine whether the recent United States Supreme Court decisions which have narrowed the protection offered in the ex post facto clause should likewise be applicable to the interpretation of Louisiana's ex post facto clause.
It has long been this State's tradition for Louisiana courts to look to federal case law for guidance in instances where our laws are patterned after or based upon federal law. See King v. Phelps Dunbar, L.L.P., 98-1805 (La.6/4/99), 743 So.2d 181, 187.[22] In the case sub judice, it is clear that not only is our constitutional prohibition against the enactment of ex post facto laws patterned after the United States constitution, our enactment is mandated by Article I, § 10 of the United States Constitution.[23] Accordingly, we find that the Collins and Morales line of jurisprudence makes our jurisprudential interpretation of ex post facto no longer viable. Therefore, we adopt the Collins and Morales line of jurisprudence which significantly narrows the definition of an ex post facto law from the "disadvantage" line of jurisprudence to whether the change alters the definition of criminal conduct or increases the penalty.

*745 IS PUBLIC NOTIFICATION PUNISHMENT?
Olivieri and Hutchinson point out that the notification requirements of Louisiana's Megan's Law contain provisions found in no other state and are made applicable to all sex offenders. They argue that the notification process places financial burdens on them, that the law is too broadly drawn as to which sex offenders are subjected to the law,[24] that failure to notify as provided by statute makes them susceptible to punishment, and that the "scarlet letter" provisions are punitive. In addition, Hutchinson contends that retroactive application of the notification provisions denies him equal protection of the law. At the heart of our discussion of these issues is the determination of whether informing the public that a sex offender is living or working in the community constitutes punishment; if that question is answered negatively, there can be no ex post facto violation. See W.P. v. Poritz, 931 F.Supp. 1199, 1211 (D.N.J.1996), reversed and remanded sub nom. E.B. v. Verniero, 119 F.3d 1077 (3d Cir.1997), cert. denied, 522 U.S. 1110, 118 S.Ct. 1039, 140 L.Ed.2d 105 (1998). The State counters by urging that Louisiana's Megan's Law was enacted with the paramount governmental interest of protecting the public from sex offenders. In that spirit, the State contends that these convicted felons, either released on probation or parole, were simply released subject to the public notification conditions provided by Louisiana's Megan's Law in effect at the time of their release. As such, the State argues that the ex post facto principle was not violated.
Although the decisions enunciated in Morales and Collins have shed light on the breadth of ex post facto protection, a majority of the courts who have considered the retroactive application of sex offender statutes have adopted a multi-faceted inquiry which basically consists of four prongs which examine: (1) the legislative intent, (2) the design of the statute, (3) whether the requirements contained in the statute have been historically considered "punishment," and (4) the effects of the statute. See Doe v. Pataki, 940 F.Supp. 603 (S.D.N.Y.1996), affirmed in part, reversed in part, 120 F.3d 1263 (2d Cir. 1997), cert. denied, 522 U.S. 1122, 118 S.Ct. 1066, 140 L.Ed.2d 126 (1998); see also Artway v. Attorney General, 81 F.3d 1235 (3d Cir.1996); E.B. v. Verniero, 119 F.3d 1077 (3d Cir.1997); cert. denied, 522 U.S. 1110, 118 S.Ct. 1039, 140 L.Ed.2d 105 (1998); Russell v. Gregoire, 124 F.3d 1079 (9th Cir.1997), cert. denied sub nom. Stearns v. Gregoire, 523 U.S. 1007, 118 S.Ct. 1191, 140 L.Ed.2d 321 (1998); Cutshall v. Sundquist, 193 F.3d 466 (6th Cir. 1999), cert. denied, 529 U.S. 1053, 120 S.Ct. 1554, 146 L.Ed.2d 460 (2000).
In Kansas v. Hendricks, 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997), a relatively recent case involving a civil commitment statute involving sexual predators, the Court developed a test to determine whether the consequence or burden of a statute constitutes "punishment" for purposes of ex post facto analysis. In Hendricks, the Court was faced with a Kansas statute which required an involuntary commitment procedure for sexually violent predators; at the heart of the statute was the provision that commitment was predicated, in part, upon the individual's prior conviction for crimes of sexual violence. The Court first focused on the legislative intent behind the enactment of the statute and then carefully examined the actual effects of the legislation on the individual affected. Following an intent/effects test, the Court determined that the legislation did not violate the ex *746 post facto provisions of the constitution. Utilizing this same intent/effects test, we now proceed to examine Louisiana's statutory scheme in light of the objections raised by Olivieri and Hutchinson.
LA.REV.STAT. ANN. § 15:540 (1992) sets out the legislative findings and the purpose behind Louisiana's Megan's Law.[25] It provides:
A. The legislature finds that sex offenders often pose a high risk of engaging in sex offenses even after being released from incarceration or commitment and that protection of the public from sex offenders is of paramount governmental interest. The legislature further finds that local law enforcement officers' efforts to protect their communities, conduct investigations, and quickly apprehend offenders who commit sex offenses are impaired by the lack of information available to law enforcement agencies about convicted sex offenders who live within the agency's jurisdiction, and the penal and mental health components of our justice system are largely hidden from public view and that lack of information from either may result in failure of both systems to meet this paramount concern of public safety. Restrictive confidentiality and liability laws governing the release of information about sex offenders have reduced willingness to release information that could be appropriately released under the public disclosure laws, and have increased risks to public safety. Persons found to have committed a sex offense have a reduced expectation of privacy because of the public's interest in public safety and in the effective operation of government. Release of information about sex offenders to public agencies, and under limited circumstances to the general public, will further the governmental interests of public safety and public scrutiny of the criminal and mental health systems so long as the information released is rationally related to the furtherance of those goals.
B. Therefore, this state's policy is to assist local law enforcement agencies' efforts to protect their communities by requiring sex offenders, to register with local law enforcement agencies and to require the exchange of relevant information about sex offenders to members of the general public.
Before addressing the expressed legislative intent, we must first examine the defendants' contention that the legislative findings and the purpose set out in LA.REV. STAT. ANN. § 15:540 should only be applied to the requirement for registration with local law enforcement. They argue that at the time of this pronouncement LA.REV. STAT. ANN. § 15:542 originally only provided that "[c]riminal justice agencies are authorized to release relevant and necessary information regarding sex offenders to the public when release of the information is necessary for public protection, according to the provisions [to be set forth] by the board pursuant to R.S. 15:547(C)." It was not until 1995 La. Acts 928 was enacted that LA.REV.STAT. ANN. § 15:542 was amended to include the mandatory forms of public notifications to that statute. See supra. n. 9.
Although we agree with the observation of Olivieri and Hutchinson, we do not find that the legislative pronouncement of findings and purpose was in any way diminished. Even though mandatory neighborhood, school, and publication procedures were initially only included in LA.REV.STAT. ANN. § 15:574.4(H) and LA.CODE CRIM. PROC. ANN. art. 895(H), both enacted in 1992 La. Acts 962, they together with LA. REV.STAT. ANN. § 15:542 were part of the several pieces of legislation enacted under separate legislative acts during the same legislative session which ultimately formed *747 this state's version of Megan's Law. Because community notice was clearly part of the body of that law, we find that the legislative pronouncement of findings and purpose is equally applicable to community notice now provided in LA.REV.STAT. ANN. § 15:542.
A careful review of the subjective intent enunciated in LA.REV.STAT. ANN. § 15:540 shows that the Legislature enacted this state's Megan's Laws with an avowedly non-punitive intent. It is clear that the laws were enacted to protect communities, aid police in their investigation of sex offenders, and enable quick apprehension of sex offenders. These enactments were further founded on the findings of the Legislature that this legislation was of paramount governmental interest because: (1) sex offenders pose a high risk of engaging in sex offenses, (2) sex offenders have a high incidence of recidivism, and (3) unless there was registration and community notification, sex offenders could remain hidden and thereby increase the risk to public safety.[26] Accordingly, it is apparent that the intent of the Legislature was to alert the public for the purpose of public safety, a remedial intent, not to punish convicted sex offenders.
Nevertheless, Olivieri and Hutchinson contend that the objective purpose of the legislature is belied by an analysis of the various effects of the legislation which reveal a punitive intent.
Making law applicable to all sex offenders. Initially, Olivieri and Hutchinson emphasize that Louisiana's Megan's Law applies to all sex offenders defined in LA. REV.STAT. ANN. § 15:542(E). They underscore that many other states have tightly tailored community notification requirements in their Megan's Laws so that sex offenders are rated for purposes of ascertaining the likelihood of recidivism. See, e.g.: N.Y. CORRECT. LAW § 168-1 (McKinney 1987 & Supp. 1999); N.J. STAT. ANN. § 2C:7 (West 1995 & Supp.1997).[27]
Our review of Louisiana's Megan's Law shows only the following exception to its community notification provisions. LA. CODE CRIM. PROC. ANN. § 895(H)(5) permits a defendant convicted of LA.REV.STAT. ANN. § 14:80(A)(1) (carnal knowledge of juvenile when there is consent between the parties, but there is an age difference of greater than two years between the two persons) to petition for relief or modification of certain conditions of LA.CODE CRIM. PROC. ANN. § 895(H).[28]
Although we might acknowledge the wisdom of other states' efforts to fine tuner community notification to those sex offenders most likely to be repeat offenders, we cannot say that this factor alone interdicts Louisiana's notification provision. The plenary power of the Legislature, in exercising the police power of the state,[29] to make all laws necessary and *748 proper to that end is broad and sweeping. DeSalvo v. State, 624 So.2d 897 (La.1993), cert. denied, 510 U.S. 1117, 114 S.Ct. 1067, 127 L.Ed.2d 386 (1994). Clearly, under the police powers granted the state legislature, the Legislature has the authority to cast a broad net to provide for public safety if the need is shown. Certainly, this all encompassing definition of sex offender utilized in Louisiana's Megan's Law fits within the findings and purpose enunciated for this legislation. LA.REV.STAT. ANN. § 15:540.
Harshness of provisions. Olivieri and Hutchinson argue that the community notification requirement and the other notice which may be required, i.e., signs, handbills, bumper stickers, or labeled clothing, make the notification provisions a second form of punishment.[30]
It cannot be gainsaid that although Louisiana's Megan's Law intends to provide communities with information about potentially dangerous sex offenders, it may be that such notification causes the sex offender humiliation. At least one court referenced American history as an example that criminals were punished through the use of public humiliation, i.e., requiring criminals to stand in public with signs to notify the public of their offense. See Russell, 124 F.3d 1079, 1091-92; see also Poritz, 931 F.Supp. at 1216-19. In differentiating that style of Colonial punishment from the use of notification in Megan's Law legislation, the court made the following salient points: (1) public humiliation and community ostracism were only possibilities when notification occurs under Megan's Law enactments, (2) photographs and mailings now replace standing in the public square and remove the sex offender from direct public contact, (3) chastisement, the goal of public standing, is not the primary purpose of Megan's Law notification; rather, notification is utilized to protect the public and deter the reoccurrence of similar crimes; and (4) correlatively, public humiliation is no longer the primary sentence of punishment. We conclude that these same findings are applicable to our analysis of Louisiana's Megan's Law. Today's society is replete with examples of instances where public notification is utilized, e.g., "wanted" posters, the FBI's most wanted list, the publication of "deadbeat" dads' picturesall of these are utilized for public protection and safety. Accordingly, we find that although Louisiana's Megan's Law has provisions which may be remotely similar to historical forms of punishment, the immediate need for public protection is a corollary of rather than an addendum to the punishment of sex offenders.
Failure to Notify Causes Additional Punishment. Olivieri and Hutchinson contend that LA.REV.STAT. ANN. § 15:542(F)(1)-(2) subject them to additional punishment should they fail to comply with the registration and notification provisions of LA.REV.STAT. ANN. § 15:542(B).
Although LA.REV.STAT. ANN. § 15:542(F)(1) and (2) do indeed provide for punishment, the crime for failing to register under the statute is a separate offense. It is inconsequential that a prior conviction for sexual misconduct triggers the offense for failure to register. "It is hornbook law that no ex post facto problem occurs when the legislature creates a new offense that includes a prior conviction as an element of the offense, as long as the other relevant conduct took place after the law was passed." Russell, 124 F.3d at 1088-89; see also United States v. Watts, 519 U.S. 148, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997).
Placing burden on offender to notify. Olivieri and Hutchinson further contend that the notification requirements constitute *749 punishment because the law imposes the burden of notification upon them and further causes them to expend money which they were not obligated to pay at the time they committed their respective offenses. They hinge their argument on the premise that the requirements place the onus on them to fulfill the public notification process, and impose on them the financial burden of mailing the requisite community notices, providing photographs, and paying the cost of two days' publication in the official journal.
Although neither Olivieri nor Hutchinson have presented any evidence of projected costs that they might incur in fulfillment of their public notification obligations, it must be acknowledged that the costs of notification, particularly in a metropolitan setting, may be weighty. As required in LA.REV.STAT. ANN. §§ 15:542(B)(2)(a) and 15:574.4(H)(2)(b) and LA.CODE CRIM. PROC. ANN . art. 895(H)(2)(a), Olivieri and Hutchinson will have to purchase postage and writing materials (postcards or paper and envelopes); similarly, under these same provisions, they will also have to acquire at least a good photocopy of a recent photograph and pay the costs of two days publication.[31]
Placement of affirmative requirements and the imposition of costs on convicted felons is hardly new to Louisiana criminal legislation. For example, a probationer is required to: submit a monthly report; meet his family responsibilities, including court ordered child support obligations; make court ordered restitution to the victim; submit to drug testing at his costs; participate in psychiatric or psychological counseling at his costs; attend adult education classes at his costs until he attains a sixth grade reading level. LA.CODE CRIM. PROC. ANN. art. 895(A)(1),(2),(7),(12); (C)(1); and (G). See also several like provisions applicable to parolees. LA.REV.STAT. ANN. §§ 15:574.4(H)(4)(c) (submit a monthly written report), (f)(work diligently at a lawful occupation and support his dependents), (o) (defray the costs of parole supervision), (p)(perform 100 hours of unpaid community service); (J)(1) (make victim restitution); (K) (pay unpaid court costs and fines); (M) (attend a GED program at his costs until he can read at a sixth grade level).
Having examined this aspect of the argument of Olivieri and Hutchinson, we find that the onus placed upon them by this legislation does not constitute a separate punishment for their offenses. Rather, it is clear that these obligations constitute a condition of their release, respectively, parole and probation, and any costs associated therewith are a necessary part of the regulatory scheme of the legislation in existence at the time of that release. See Bickman v. Dees, 367 So.2d 283 (La.1978). Moreover, we hasten to add that the economically harsh results of this well justified system of public notification is not the result of governmental action, but as a consequence of the sex offenders' crimes. As such, we find that there is no infraction of the ex post facto prohibitions of the federal and state constitutions.

CONCLUSION
Having considered the legislative findings and purpose of Louisiana's Megan's Law, we conclude that the effect of the interrelated components of this legislation is not so obtrusive that we would find it punitive rather than remedial or regulatory as was the intention of the Legislature. We are cognizant that this legislation may impact a sex offender's life in a long-lived and intense manner. However, we observe that "whether a sanction constitutes punishment is not determined from the defendant's perspective." Dept. *750 of Revenue v. Kurth Ranch, 511 U.S. 767, 777, 114 S.Ct. 1937, 128 L.Ed.2d 767 (1994). Moreover, the information of the sex offender's conviction is of public record and is not confidential; accordingly, we are not faced with the closer question of whether this legislation orders dissemination of privileged information. Thus, dispersion of that public information, though burdensome to the sex offender and certainly harsh, is not an infringement of the ex post facto principle recognized in the federal and state constitutions. Therefore, considering the foregoing, we cannot say that the legislation before us violates the constitutional prohibition against the enactment of ex post facto laws.

EQUAL PROTECTION
Hutchinson, without citation of authority, further contends that the retroactive application of LA.CODE CRIM. PROC. ANN. art. 895(H) will deny him his right to equal protection of the law. He argues that unless the State can locate and identify every sex offender who might fall within the purview of the statute, it will lead to the arbitrary distinguishment between those so located and identified and those who will escape the law.
We find no merit to Hutchinson's contention. On their faces, the notification provisions of both LA.CODE CRIM. PROC. ANN. art. 895(H) and LA.REV.STAT. ANN. § 15:542 apply to all similarly situated sex offenders. The State's possible inability to identify and locate some of the sex offenders subject to these statutory provisions, without a more particularized showing, does not mean that it has applied the statutes, or will do so in the future, in a discriminatory manner.

DECREE
For the foregoing reasons the judgments of the lower courts are affirmed. The stay granted by the district court in State v. Hutchinson on June 30, 1997 is lifted and that matter is remanded to district court for action consistent with this opinion. Our stay granted in State ex rel. William Olivieri v. State on October 31, 2000, is likewise lifted and that matter is remanded to the Board of Parole for further action consistent with this opinion.
AFFIRMED AND REMANDED.
CALOGERO, C.J., and KIMBALL, J., concur in part, dissent in part and assign reasons.
GULOTTA, J. Pro Tem., dissents in part, concurs in part and joins in the reasons assigned by the Chief Justice.
CALOGERO, Chief Justice, concurring in part and dissenting in part.
The majority today finds that the constitutional prohibitions on ex post facto legislation are not violated by the retroactive application of: (1) the sex offender registration requirements of La.Rev.Stat. § 15:542(A) (applying to all persons pleading guilty or being convicted of a sex offense) or (2) the sex offender notification requirements of three separate statutes: La.Rev.Stat. § 15:542(B) (offenders convicted and later released from prison), § 15:574.4(H)(2) (parolees), and La.Code Crim. Pro. art. 895(H) (probationers). I agree with the first conclusion that requiring sex offenders to register with local law enforcement agencies does not violate the ex post facto provisions of the United States and Louisiana Constitutions. It is the second holding regarding the sex offender notification requirements for parolees, probationers, and persons released from confinement with which I must disagree.
The three sex offender notification statutes before us impose on the offender similar requirements, with minor differences, depending on whether he is placed on probation, paroled from prison, or released after serving his sentence. A sex offender who has either pleaded guilty or been convicted after trial, upon release from confinement, must give notice of his name, home address, and the crime of which he has been convicted to:

*751 (1) At least one person in every residence or business within a one-mile radius in a rural area or within a three block radius in an urban or suburban area by mail,
(2) The superintendent of the school district where the defendant will reside who then forwards this information to schools within a one mile radius of the defendant's residence and all others he deems appropriate, and
(3) The lessor, landlord, or owner of the residence or the property where he resides.
La.Rev.Stat. § 15:542(B). Additionally, the offender must publish a notification, with a photograph, in the official journal of the parish in which he resides as well as a second newspaper meeting the official journal requirements if so ordered by the sheriff of police department of the area.
Similarly, a sex offender who is paroled from prison must give notice of his name, home address, and the crime of which he has been convicted to:
(1) "People who live within a one-mile radius in a rural area or within a three block radius in an urban or suburban area" by mail,[1]
(2) The superintendent of the school district where the defendant will reside who then forwards this information to schools within a one mile radius of the defendant's residence and all others he deems appropriate along with a photograph of the offender supplied by the offender, and
(3) The superintendent of the park, playground, and recreation districts within a one-mile radius in a rural area or within a three block radius in an urban or suburban area who then forwards this information to the custodians of parks, playgrounds, and recreation districts within the designated area and all other he deems appropriate along with a photograph of the offender supplied by the offender.
La.Rev.Stat. § 15:574(H)(2). Additionally, the offender must publish a notification, with a photograph, in the official journal of the parish in which he resides as well as a second newspaper meeting the official journal requirements.
Finally, a sex offender placed on probation must give notice of his name, home address, and the crime of which he has been convicted to:
(1) "People who live within a one-mile radius in a rural area or within a three block radius in an urban or suburban area" by mail,
(2) The superintendent of the school district where the defendant will reside who then forwards this information to schools within a one mile radius of the defendant's residence and all others he deems appropriate along with a photograph of the offender supplied by the offender, and
(3) The superintendent of the park, playground, and recreation districts within a one-mile radius in a rural area or within a three block radius in an urban or suburban area who then forwards this information to the custodians of parks, playgrounds, and recreation districts within the designated area and all other he deems appropriate along with a photograph of the offender supplied by the offender.
La.Code Crim. Pro. art. 895(H). Additionally, the offender must publish a notification, with a photograph, in the official journal of the parish in which he resides as well as a second newspaper meeting the official journal requirements if so ordered by the court.
Importantly, in all three notification statutes, the cost for providing all of the *752 notices to the individuals (address lists, photographs, writing materials, letters or postcards, postage, etc.) must be borne by the offender.[2] Additionally, the costs of publication in the official journal of the parish as well as a second newspaper (a total of four advertisements) must be borne by the offender. Finally, these notification provisions additionally require a sex offender to give notice in the form of "signs, handbills, bumper stickers, or clothing labeled to that effect" when directed to do so by the court or, in the case of parolees, the Board of Parole. While the record does not indicate exactly what amount of costs will be borne by an offender complying with these extensive notification requirements, they can reasonably be expected to run into the hundreds of dollars; even the majority admits that they will be "weighty." See ante p. 749.
Today, in response to recent pronouncements by the United States Supreme Court, we adopt the analysis used by that court in determining whether a statute violates the ex post facto provisions of the United States or Louisiana Constitutions.[3] Under this analysis, a court must first determine whether the statute at issue is intended to be punitive or regulatory. See Hudson v. United States, 522 U.S. 93, 99, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997). If intended to be punitive, retroactive application of the statute runs afoul of the ex post facto clauses and the inquiry ends. On the other hand, if the statute has a non-punitive purpose, we are required to determine whether the statutory scheme is so punitive in effect as to "transform what was clearly intended as a civil remedy into a criminal penalty." Hudson, 522 U.S. at 99, 118 S.Ct. 488 (quoting Rex Trailer Co. v. United States, 350 U.S. 148, 154, 76 S.Ct. 219, 100 L.Ed. 149 (1956)). The determination of whether an intended civil remedy has a punitive effect is made by the consideration of seven factors:
[1] Whether the sanction involves an affirmative disability or restraint, [2] whether it has historically been regarded as a punishment, [3] whether it comes into play only on a finding of scienter, [4] whether its operation will promote the traditional aims of punishmentretribution and deterrence, [5] whether the behavior to which it applies is already a crime, [6] whether an alternative purpose to which it may rationally be connected is assignable for it, and [7] whether it appears excessive in relation to the alternative purpose assigned.... *753 Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168-69, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963) (footnotes omitted), cited in, Hudson, 522 U.S. at 99-100, 118 S.Ct. 488. In my view, despite the majority's conclusion to the contrary, the notification provisions of the statutes at issue are so punitive in effect so as to transform what may have been intended as a civil remedy into a punitive one.
First, in this case, the Legislature has stated that the registration and notification provisions are intended to "protect their communities, conduct investigations, and quickly apprehend offenders who commit sex offenses and crimes against victims who are minors." La.Rev.Stat. § 15:540. This is an avowedly non-punitive purpose and there has been no evidence that the Legislature in fact intended otherwise. Therefore, the first prong of the federal analysis is satisfied and we must further examine whether the statutory scheme is so punitive in effect as to "transform what was clearly intended as a civil remedy into a criminal penalty." Hudson, 522 U.S. at 99, 118 S.Ct. 488 (quoting Rex Trailer Co. v. United States, 350 U.S. 148, 154, 76 S.Ct. 219, 100 L.Ed. 149 (1956)). Of the Kennedy factors outlined above, the first and the second of these considerations in particular support the conclusion that the notification requirements of the statutes at issue are so burdensome as to transform them into a punitive penalty.
The first factor in this analysis (whether the sanction in this case operates as an affirmative disability and restraint) is evident in this case. As pointed out above, the cost required for undertaking this notification will likely run into the hundreds of dollars. The majority is correct when they point out that not all changes in an offender's burdens constitute an ex post facto violation; on the other hand, in my view, the substantial nature of this financial burden (in the hundreds of dollars) would indicate that it is an affirmative disability amounting to punishment. Unlike the minimal costs and reporting requirements cited by the majority, the notification requirements under these statutes require the offender to go through great pain, financial and otherwise, in satisfaction of those provisions.[4] For ten years, the offender is subject to these notification requirements and, under them, must contact a wide range of people through both mailings and the advertising media. In short, this expensive burden, in my view, is the equivalent of a fine. It is not simply a regulatory cost.[5] Therefore, the notification requirements of the statutes at issue operate as an affirmative disability to a defendant because of the financial and other burdens they impose. The notification requirements, as imposed by the statutes at issue, therefore, constitute a punitive penalty.
The second factor in this analysis asks us to determine whether the burden placed on the offender has been historically regarded as punishment. In this case, that factor is present as well.
One such practice historically utilized for punishing criminals was public humiliation and degradation. Such method of punishment, developed during the seventeenth century, was branding, in which a single letter representing the first letter of the crime committed was burned onto the wrongdoer's face. *754 Murderers were branded with the letter "M," thieves with a "T," fighters and brawlers with an "F," and vagrants with a "V." Historians note the branding had the effect of a spell. It took the criminal out of ordinary relations with humanity, and enclosed him in a sphere by himself.
The purpose of branding in the seventeenth century was to make certain persons or groups of persons easily identifiable and thus, easily ostracized or set apart. An example of branding (without fire) was the requirement in Nazi Germany that Jewish persons wear the Star of David on a sleeve so they might be easily identified.
Note, Doe v. Poritz: a Constitutional Yield to an Angry Society, 32 Cal. W.L. Rev. 331, 347-48 (1996) (footnotes collecting authorities omitted). The statutory scheme created by Louisiana's notification laws specifically permit a court or, in the case of a parolee, the Board of Pardons, to order the offender to place notifications of his status as a sex offender on his car in the form of bumper stickers or even on the offender's clothing. It is hard to imagine a more punitive method of public humiliation or degradation than requiring an offender to wear a Scarlet Letter notifying the public of his past wrongs. Therefore, the burden placed on the offender is one which has been historically regarded as punishment. Consequently, the notification provisions of La.Rev.Stat. §§ 15:542(B), 574.4(H)(2), and La.Code Crim. Pro. art. 895(H) constitute punishment in violation of the ex post facto clauses of the United States and Louisiana Constitutions.
In light of the above analysis, I would find that the sex offender notification laws transform what may have been intended as a civil remedy into a punitive one. Therefore, retroactive application of this new punishment attendant to community notification on sex offenders who have committed their crimes prior the enactment of these notification provisions violates the United State and Louisiana Constitutional prohibitions on ex post facto legislation.
Accordingly, I concur in the majority's holding concerning the registration requirements of Louisiana's Megan's laws, but I respectfully dissent from the finding by the majority that the notification requirements of these laws do not pose an ex post facto violation.
KIMBALL, J., concurring in part and dissenting in part.
I agree with the majority's finding that the statutory requirement that sex offenders register with local law enforcement agencies does not violate the ex post facto provisions of the Louisiana or United States Constitution through retroactive application. However, I respectfully dissent from the majority's conclusion that the notification requirements of La. Rev. Stats. §§ 15:542 and 15:574.4 and La.Code Crim. Proc. art 895 do not impose an additional penalty on offenders whose crimes were committed before those statutory provisions were enacted. In my view, the retroactive application of the sex offender notification requirements violate Louisiana and federal ex post facto principles.
NOTES
[*] James C. Gulotta, Justice Pro Tempore, sitting for Associate Justice Harry T. Lemmon.
[1] Although Olivieri originally objected to the provision which requires registration with local police, he has withdrawn his objection before us. This requirement has almost unanimously been upheld against ex post facto challenges because courts have viewed this requirement as merely a regulation, not additional punishment. See, e.g., Doe v. Pataki, 940 F.Supp. 603 (S.D.N.Y.1996), affirmed in part, reversed in part, 120 F.3d 1263 (2d Cir. 1997), cert. denied, 522 U.S. 1122, 118 S.Ct. 1066, 140 L.Ed.2d 126 (1998 ); Russell v. Gregoire, 124 F.3d 1079 (9th Cir.1997). Even though his objection has been withdrawn, as a matter of completeness we will refer to the registration provisions with local law enforcement in our prefatory discussion of Louisiana's Megan's Law. Hutchinson has not attacked this aspect of the law.
[2] The July 29, 1994, rape and murder of Megan Kanka, a seven-year old New Jersian, at the hands of her neighbor, a thirty-three year old who had previously served six years imprisonment for aggravated assault and attempted sexual assault of a child, served as the impetus for state legislatures throughout the nation to enact sex offender registration requirements and provisions for community notification. See James Popkin et al., Natural Born Predators, U.S. News & World Rep., Sept. 19, 1994, at 64; Ryan A. Boland, Comment, Sex Offender Registration and Community Notification: Protection, Not Punishment, 30 NEW ENGLAND L. REV. 183 (1995). See also Christine M. Kong, The Neighbors are Watching: Targeting Sexual Predators with Notification Laws, 40 VILL. L. REV. 1257, 1258 (1996). All fifty states have enacted sex offender registration laws of varying scope. John Gibeaut, Defining Punishment: Courts Split on Notification Provisions of Sex Offender Laws, A.B.A.J., Mar. 1997, at 36. For a list of all the sex offender statutes each state has enacted see People v. Ross, 169 Misc.2d 308, 646 N.Y.S.2d 249, 250 n. 1 (Sup.Ct.1996). In addition to the Kanka murder, the Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Program Act ("Jacob Wetterling Act"), 42 U.S.C. § 14071 (1994), encouraged states to enact sex offender registration laws. Although community notification was not initially required, Congress amended the Jacob Wetterling Act in 1996 to require neighborhood notification when sex offenders move into a community. Amy L. Van Duyn, Notification Provisions in Sex Offender Statutes, 47 DRAKE L. REV. 635, 643 (1999).
[3] "When a prisoner committed to the Department of Public Safety and Corrections is released because of diminution of sentence pursuant to this Part, he shall be released as if released on parole ." LA.REV.STAT. ANN. § 15:571.5(A)(1).
[4] The proviso which permitted exclusion from community notification was repealed by 1999 La. Acts 594, § 2.
[5] Judge Plotkin dissented, reasoning that Hutchinson did not have fair warning in 1990 of the consequences to which he is now being subjected and, because the change in law worked to his disadvantage, concluded that the constitutional provisions against ex post facto laws require that he not be subjected to them. State v. Hutchinson, 99-0034, 99-0035 (La.App. 4 Cir. 5/17/00), 764 So.2d at 1143 (Plotkin, J., dissenting).
[6] See infra notes 11 and 15 which limit the application of this definition somewhat for purposes of LA.CODE CRIM. PROC. ANN. art. 895(H) and LA.REV.STAT. ANN. § 15:574.4(H)(2), respectively.
[7] LA.REV.STAT. ANN. § 14:92(A)(7), contributing to the delinquency of juveniles by any immoral act; Subpart C of Part II: LA.REV.STAT. ANN. § 14:41, rape; LA.REV.STAT. ANN. § 14:42, aggravated rape; LA.REV.STAT. ANN. § 14:42.1, forcible rape; LA.REV.STAT. ANN. § 14:43, simple rape; LA.REV.STAT. ANN. § 14:43.1, sexual battery; LA.REV.STAT. ANN. § 14:43.2, aggravated sexual battery; LA.REV.STAT. ANN. § 14:43.3, oral sexual battery; LA.REV.STAT. ANN. § 14:43.4, aggravated oral sexual battery; LA. REV.STAT. ANN. § 14:43.5, intentional exposure to AIDS virus; Subpart B of Part IV: LA.REV. STAT. ANN. § 14:76, bigamy; LA.REV.STAT. ANN. § 14:77, abetting bigamy; LA.REV.STAT. ANN. § 14:78, incest; LA.REV.STAT. ANN. § 14:78.1, aggravated incest; Subpart A(1) of Part V: LA.REV.STAT. ANN. § 14:80, carnal knowledge of a juvenile; LA.REV.STAT. ANN. § 14:81, indecent behavior with juveniles; LA.REV.STAT. ANN. § 14:81.1, pornography involving juveniles; LA.REV.STAT. ANN. § 14:81.2, molestation of a juvenile; Subpart A(4) of Part V: LA.REV.STAT. ANN. § 14:89, crime against nature; LA.REV. STAT. ANN. § 14:89.1, aggravated crime against nature.
[8] 1997 La. Acts 928 amended this statute to extend the provisions of LA.REV.STAT. ANN. § 15:542 to a juvenile who has pleaded guilty or has been convicted of a sex offense as provided in the LA. CHILD. CODE art. 857. Neither Olivieri nor Hutchinson are juveniles and thus our discussion of the statutes focuses only on adult offenders. It is also only through this general provision that probationers and parolees must register with local law enforcement agencies; neither LA.REV.STAT. ANN. § 15:574.4(H) nor LA.CODE CRIM. PROC. ANN. art. 895 has a provision requiring registration with the local law enforcement agencies.
[9] Worthy of note is the fact that the mandatory neighborhood, school, and publication procedures were only included in LA.REV.STAT. ANN. § 15:574.4(H) and LA.CODE CRIM. PROC. ANN. art. 895(H). LA.REV.STAT. ANN. § 15:542 originally only provided that "[c]riminal justice agencies are authorized to release relevant and necessary information regarding sex offenders to the public when release of the information is necessary for public protection, according to the provisions [to be set forth] by the board pursuant to R.S. 15:547(C)." LA. REV.STAT. ANN. 15:546(A). It was not until 1995 La. Acts 928 was enacted that LA.REV. STAT. ANN. § 15:542 was amended to include the mandatory forms of notifications to that statute.
[10] Although neither LA.REV.STAT. ANN. § 15:542(F)(1) or (F)(2) reference the failure to notify the community, our reading of the statute as a whole evidences no intent to differentiate between registration and notification; in fact, the language of the statute indicates that notification of the community is an adjunct registration requirement.
[11] The sex offenses are identical to those enumerated in LA.REV.STAT. ANN. § 15:542(E) except it is limited to those sex offenses for which "probation is permitted by law." LA. CODE CRIM. PROC. ANN. art. 895(H).
[12] Unlike LA.REV.STAT. ANN. § 15:542(B)(1)(b), there is no obligation that the school superintendent notify the various principals nor must the principals post public notice. Likewise, there is no requirement that the offender notify his lessor or landlord. However, in addition to notification of the community, the school district, and publication in the newspaper, the defendant must also give notice to "[t]he superintendent of the park, playground, and recreation districts within the designated area." LA.CODE CRIM. PROC. ANN. art. 895(H)(a)(c)(1).
[13] Hutchinson was not subjected to this requirement. However, Hutchinson, as a condition of probation, was ordered by the sentencing judge to pay $4,000 for psychological treatment of the victim; he raised no objection to this condition of probation.
[14] Hutchinson was participating in a counseling program at the time of sentencing. The sentencing court, noting his participation, continued his psychological counseling as a further condition of probation. Hutchinson did not raise any objection to this condition of probation.
[15] The sex offenses are identical to those enumerated in LA.REV.STAT. ANN. § 15:542(E) except it is limited to those sex offenses for which "parole is permitted by law." LA.REV. STAT. ANN. § 15:574.4(2). Somewhat different than the other provisions, however, the notice provisions only come into play if "the victim was under eighteen years of age at the time of the commission of the offense." Id. Although we find that Olivieri should have been relieved of his notification obligations under his parole conditions because his victim was thirty-six years of age at the time of the commission of his offense, he was nonetheless subject to the notification provisions provided generally in LA.REV.STAT. ANN. § 15:542(B)-(D). Accordingly, our treatment of his ex post facto objections is not dicta.
[16] Unlike LA.REV.STAT. ANN. § 15:542(B)(1)(b), there is no obligation that the school superintendent notify the various principals nor must the principals post public notice. Likewise, there is no requirement that the offender notify his lessor or landlord. However, like the probation provisions in LA.REV.STAT. ANN. § 15:542, in addition to notification of the community, the school district, and publication in the newspaper, the parolee must also give notice to "[t]he superintendent of the park, playground, and recreation districts within the designated area where the offender will reside."
[17] This provision was not applicable to Olivieri as a parolee.
[18] "No State shall ... pass any ... ex post facto Law,...." U.S. CONST. ART. I, § 10.
[19] Legal commentators have interpreted the first three Calder categories as restrictions on substantive criminal law and the fourth as a procedural restriction. See LAFAVE, SCOTT, SUBSTANTIVE CRIMINAL LAW, § 2.4 (1986). We are not presented with an issue which involves the fourth category. However, we note for purposes of completeness that in Carmell v. Texas, 529 U.S. 513, 120 S.Ct. 1620, 146 L.Ed.2d 577 (2000), a case involving the fourth ex post facto category, the Supreme Court reaffirmed the fourth Calder category.
[20] See supra note 19 which references Carmell, 529 U.S. at 522, 120 S.Ct. 1620 for the continued viability of Calder's fourth ex post facto category regarding a law which alters the rules of evidence. Our exclusion of that ex post facto category at this juncture is not to be interpreted as our rejection of that category.
[21] "No ... ex post facto law ... shall be enacted." LA. CONST. art. I, § 23.
[22] Although the Louisiana Constitution can provide greater rights than the federal constitution, Sibley v. Board. of Sup'rs of Louisiana State Univ., 477 So.2d 1094, 1104-08 (La. 1985), the language of our ex post facto provision does not significantly differ from that provided in the federal constitution. Compare n. 20 to n. 22. Moreover, in State v. Johnson, 94-1077 (La.1/16/96), 667 So.2d 510, 513, we recognized that the definition of punishment for purposes of double jeopardy analysis is the same under the Louisiana and United States Constitutions; accordingly, we concluded that federal precepts which interpreted punishment would be utilized for purposes of double jeopardy analysis in this state. Id. At least one federal appellate court, the Second Circuit, has stated in U.S. v. Certain Funds, 96 F.3d 20, 26 (2d Cir.1996), cert. denied sub nom. Sai-Man v. United States, 519 U.S. 1113, 117 S.Ct. 954, 136 L.Ed.2d 841 (1997) that although United States v. Ursery, 518 U.S. 267, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996), a case which considered "punishment" in the context of civil forfeiture, was based upon a double jeopardy challenge, its analysis was equally applicable to ex post facto challenges.
[23] On September 13, 1973, at the Louisiana Constitutional Convention, this constitutional provision was presented as one rooted in the United States Constitution and one already contained in the Louisiana Constitution of 1921. The discussion on this article was extremely limited and at no time was a broader interpretation of ex post facto proposed for consideration. VOLUME VII, RECORDS OF THE LOUISIANA CONSTITUTIONAL CONVENTION OF 1973: CONVENTION TRANSCRIPTS 1223 (1977).
[24] At this juncture, we point out that the two cases before us involve individuals whose crimes were committed prior to the enactments of Louisiana's Megan's Law. Even if we were to find that the provisions of that law violate the ex post facto clause, it would not make the statutes unconstitutional; the statutes could still be applied to those convicted of sexual crimes after the statutes' effective date.
[25] Subsequently, the Legislature has further specified that sex offenders often prey on minor children and communities are plagued with the threat of violent sexual predators. See 1997 La. Acts 1147.
[26] In light of the Legislature's further refinement of its findings and statement of purpose for the enactment of this State's Megan's Laws, it is also clear that minors are often the victims of sex offenders. See n. 24, supra.
[27] A review of the addendum to Olivieri's brief shows that just over half of the states utilize some sort of classification system; the other half employ no system of classification.
[28] As noted earlier, LA.REV.STAT. ANN. § 15:574.4(H)(2) requires the Board of Parole to impose community notification on parolees whose "victim was under eighteen years of age at the time of the commission of the offense." As such, it may be concluded that such a condition may not be imposed if the victim is over the age of eighteen. Although LA.REV.STAT. ANN. § 15:574.4(H)(2) may not require public notice as a condition of parole in those cases where the victim was over the age of eighteen at the time of the commission of the crime, LA.REV.STAT. ANN. § 15:542, the general statute, nevertheless extends public notification to a defendant released from confinement. Thus, as a person released from confinement. Olivieri must comply with the public notification requirement.
[29] In City of Baton Rouge v. Ross, 94-0695 (La.4/28/95), 654 So.2d 1311, 1319, we defined the police power as "[t]he power vested in the legislature to make, ordain, and establish all manner of wholesome and reasonable laws, statutes, and ordinances ... not repugnant to the constitution, as they shall judge to be for the good and welfare of the commonwealth, and of the subjects of the same."
[30] Neither Olivieri nor Hutchinson was required to give notice by using signs, handbills, bumper stickers or labeled clothing as provided in LA.REV.STAT. ANN. § 15:542(B)(3).
[31] The record does not show the financial condition of Olivieri. However, the record shows that Hutchinson may not be impecunious; on one occasion in the trial court he sought a continuance of his hearing because he was scheduled to take an oceangoing cruise.
[1] The breadth of this language could be read to include every person within the designated area, not simply one person in each residence or business as in the case of persons released from prison after serving their sentence.
[2] Incidentally, all states and the federal government have passed some form of these notification requirements, but only Louisiana and Alabama require that notification be given directly to neighborhood residents and Alabama's designated area for notification is not as broad as Louisiana's. See Ala.Code § 15-20-21(a)(2).
[3] For over one-hundred years, both federal and Louisiana jurisprudence interpreted the ex post facto clauses of the United States and Louisiana constitutions to prohibit legislation which altered the situation of the accused to his disadvantage. See, e.g., State v. Glover, 93-2330, p. 19 (La.09/05/95), 660 So.2d 1189, 1200; State v. Sepulvado, 342 So.2d 630, 635 (La.1977); State v. Ardoin, 24 So. 802, 802 (La.1899). The United States Supreme Court, in Collins v. Youngblood, 497 U.S. 37, 52, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990), reversed this "disadvantage" definition of ex post facto legislation in favor of the more narrow inquiry that we make today, i.e., does the provision at issue punish the individual in some way. The United States Supreme Court, needless to say, has the last say when it comes to the interpretation of federal rights and guarantees under the United States Constitution. Further, it is incumbent on the states, including Louisiana, to respect the United States Supreme Court's precedent in that regard especially when the United States Constitution, which is ultimately interpreted by that Court, specifically provides that "No state shall ... make any ... ex post facto law." Accordingly, unlike certain areas of state constitutional law which provide greater protections to the individual than its federal counterpart, see, e.g., State v. Perry, 610 So.2d 746, 750 (La. 1992) (cruel and unusual punishment); State v. Hernandez, 410 So.2d 1381, 1385 (La.1982) (search and seizure), we must follow the United States Supreme Court's jurisprudence in this area and therefore adopt this line of reasoning.
[4] The issue presented in this case is not whether the notification provisions at issue here are inhumane, unfair, or should be imposed at all. Instead, the narrow issue presented in this case is only whether the retroactive application of the notification and registration requirements offends the ex post facto prohibitions of the United States and Louisiana Constitution.
[5] Assuming for the moment that the majority is correct when it concludes that these burdens are similar to those already imposed upon probationers and parolees and, thus, are permissible, that analogy cannot logically apply to sex offenders who serve their sentence and are then released. Under La.Rev.Stat. § 15:542, an offender who serves the entirety of his sentence, upon release, is subjected to these additional financial burdens that were not in place when he committed his crime.