KNOLL, Justice.
1 iThis case comes to us as a criminal appeal concerning the retroactive application of an amendment extending supervision for sex offenders when the victim is under the age of thirteen years. Specifically, whether the amendment to La.Rev. Stat. § 15:561.2, which extended the supervision period after release from custody for a sex offender whose victim was under thirteen years of age from five years to life, violates the Ex Post Facto Clauses of both the United States and Louisiana Constitutions.
Defendant Rudy Troselair pled guilty to sexual battery of a child under thirteen years of age, for which he was sentenced to serve thirty months imprisonment at hard labor “without benefit.” Shortly after his incarceration, La.Rev.Stat. § 15:561.2 was amended to provide for lifetime supervision. Upon his release from custody, defendant was placed under lifelong supervision in accordance with the amended provision. Defendant then filed a motion in the district court challenging the retroactive application of the amendment as a violation of the Ex Post Facto Clause. The district court denied the motion, but the court of appeal granted writs and found the amendment increased the penalty for the offense and could, therefore, not be applied retroactively to the defendant. The |2State appealed to this Court in accordance with La. Const, art. V, § 5(D). For the following reasons, we find, after first converting this appeal to an application for supervisory writs, the *342 amended supervised release provisions are predominantly nonpunitive in both intent and effect, and therefore, their retroactive application to this defendant does not offend the Ex Post Facto Clause. Accordingly, we grant the State’s application and reverse the judgment of the court of appeal.
FACTS AND PROCEDURAL HISTORY
On October 16, 2006, the State alleged in a bill of information that defendant, age twenty-seven, committed sexual battery by fondling the genitals of the child victim at some point between October 7, 2002, and May 15, 2006, when the victim was between four and seven years of age. When interviewed by police, defendant confessed to touching and rubbing the child’s vagina while she slept at his home. On May 19, 2008, defendant pled guilty to sexual battery in violation of La.Rev.Stat. § 14:43.1. The district court advised defendant of the sex offender registration and notification requirements and sentenced him pursuant to the plea agreement to serve thirty months imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.[1] At that time, La.Rev. Stat. § 15:561.2 required any person convicted of a sex offense on or after August 15, 2006, when the victim was under thirteen years of age, be placed under supervision for five years after release from custody. Defendant was released after serving the full term of his sentence on November 24, 2010, by which time La.Rev.Stat. § 15:561.2 had been amended by 2008 La. Acts 672 to require lifelong supervision. On January 10, 2011, defendant was placed under lifelong supervision in accord with the amended provision after signing a “Sex Offender, Sexually Violent laPredator, or Child Predator Contract,” acknowledging his understanding of the notification, registration, and supervision requirements applicable to him. Three days later, on January 13, 2011, defendant filed a motion to terminate supervision and seeking permission to have contact with his biological children, which motion the district court denied after a hearing.[2] On January 25, 2011, defendant filed a “Motion to Declare La. R.S. 15:561 Unconstitutional,” challenging the retroactive application of the amendment as a violation of the Ex Post Facto Clause.
In his motion, defendant contended that placing him on lifetime supervision violated the Ex Post Facto Clause because it imposed a greater punishment than that authorized at the time he pled guilty. Defendant further contended the amended provision was vague and overbroad. At the February 23, 2011 motion hearing, defendant also argued the condition of supervision prohibiting contact with children had effectively terminated his parental rights without a hearing, which, defendant claimed, violated the Due Process Clause. The district court denied the motion and indicated it would not address the Due Process claim at that time because it was not asserted in the motion.
The Court of Appeal, Fifth Circuit granted defendant’s application for supervisory writ and vacated the lower court’s *343 ruling, holding the retroactivity provision of La.Rev.Stat. § 15:561 et seq. with reference to supervised release was unconstitutional as applied to defendant for a period in excess of five years. State v. Trosclair, 11-0312, p. 9 (La.App. 5 Cir. 6/20/11) (un-pub’d). In reaching its conclusion, the appellate court paid close attention to the United States Supreme Court’s decision in Smith v. Doe, 538 U.S. 84, 123 S.Ct. 1140, 155 L.Ed.2d 164 4(2003), which held the Alaska Sex Offender Registration Act was nonpunitive, and therefore, its retroactive application did not violate the Ex Post Facto Clause. In particular, the appellate court focused on the high court’s rejection of the Ninth Circuit’s determination that Alaska’s registration system “is parallel to probation or supervised release in terms of the restraint imposed” and the implication “that had it been considering probation and supervised release, the outcome might have been different.” Trosclair, 11-0312 at p. 5.
Contrasting the freedoms of a registrant in Alaska with the constraints imposed on the supervised in Louisiana, the appellate court reasoned:
Unlike the Alaskan registration statute which allows offenders to live, move, and work as they wish, with no supervision, the provisions of La. R.S. 15:561.5 gives the supervised release officer the authority to make decisions for the offender. For example, La. R.S. 15:561.5(15) provides that the offender must “[s]ub-mit a residence plan for approval by the supervised release officer.” (emphasis added). This language, which means that the parole officer has the authority to reject the offender’s proposed residence plan, is unlike the Alaskan statute, which allows offenders to move freely without supervision.
In his application for supervisory review, [defendant] points to several other provisions of La. R.S. 15:561 et seq. which he contends places an undue burden on him. He points out that:
[t]he law requires a minimum of once a month meetings with a probation or parole officer. La. R.S. 15:561.5(2). It subjects the offender to unannounced periodic visits by the officer. La. R.S. 15:561.5(3). It allows for the requirement of a curfew. La. R.S. 15:561.5(4). It provides that the offender is not allowed to use or possess any alcoholic beverages or legal ‘sexually explicit material.’ La. R.S. 15:561.5(5)(6). It limits and restricts the adult persons with whom an offender may associate. La. R.S. 15:561(8). It requires the offender to allow the department to monitor his electronic communications and internet access. La. R.S. 15:561(16). Finally, it provides additional criminal penalties for failure to comply with supervised release. La. R.S. 15:561.7.
Though the majority of the conditions [defendant] cites were enacted at the time he was convicted, he was not subject to those conditions for his lifetime.
| BTrosclair⅛ 11-0312 at pp. 6-7. The court then concluded the modification of the period of supervised release from a de min-imis period of five years to lifetime supervision increased the penalty by which defendant’s crime was punishable so that the retroactive application of these provisions to this defendant would violate the constitutional prohibition against ex post facto legislation. Trosclair, 11-0312 at 9.[3]
The State then sought and was granted a direct appeal to this Court, which appeal was lodged on October 19, 2011.
*344 DISCUSSION
As an initial matter, the State describes the present case as a facial constitutional challenge and characterizes the ruling of the court below as a declaration of the statute’s unconstitutionality. Defendant, however, disagrees and argues the appellate court did not declare any portion of La.Rev.Stat. §§ 15:561 et seq. unconstitutional; instead, it issued a narrow ruling declaring the amendment, which extended the period of supervision from five years to life, could not be retroactively applied to him because such application would violate the Ex Post Facto Clause.
Defendant is correct that a law was not declared unconstitutional, other than as applied retroactively to him. We find the district court erred in granting the State’s motion to appeal directly to this Court pursuant to La. Const, art. V, § 5(D)(1). See, e.g., State in the Interest of A.S., 97-0806 (La.9/26/97), 701 So.2d 965 (per cu-riam). Consequently, review of the court of appeal’s ruling can occur only by way of this Court’s discretionary supervisory authority pursuant to La. Const, art. V, § 5(A). Therefore, to reach the merits of an issue that directly [ ^implicates the functioning and breadth of a complex regulatory scheme, which the Legislature itself has described as “one of the most extensive sex offender registration and notification provisions in the United States,” La.Rev. Stat. § 15:561(A), we re-designate the present appeal as an application for supervisory writ and hereby grant certiorari.
Turning now to the merits, we begin our discussion with an overview of the regula-. tory scheme of supervision and the statutory provisions governing this scheme. La.Rev.Stat. §§ 15:561 through 15:561.7, added by Acts 2006, No. 242, § 1, effective August 15, 2006, provide for supervised release of certain sex offenders who committed their crimes upon children under thirteen years of age. In Section 561, the Legislature sets forth its findings associated with the enactment of the supervised release laws:
A. The Legislature of Louisiana has long recognized the need to protect our most innocent and defenseless citizens from sex offenders, sexually violent predators, and child predators and has enacted statutory provisions to provide some of the strictest criminal penalties for the commission of sex offenses, and one of the most extensive sex offender registration and notification provisions in the United States.
B. The legislature finds that sex offenders, sexually violent predators, and child predators often pose a high risk of engaging in sex offenses and crimes against victims who are minors even after being released from incarceration or commitment and that the protection of the public from sex offenders, sexually violent predators, and child predators is of paramount governmental interest.
C. In consideration of the potential high rate of recidivism and the harm which can be done to the most defenseless members of the public by sex offenders, sexually violent predators, and child predators, the state has a compelling interest in ensuring compliance with the provisions of law regarding sex offender registration and notification to protect the public from harm as those offenders are released from incarceration and are returned to their communities.
D. It is, therefore, the policy of this state to assist local law enforcement agencies’ efforts to protect the citizens of this state by facilitating compliance with the requirements of registration and notification for sex offenders and sexually violent predators and to 17ensure that compliance by requiring *345 sex offenders to be placed upon supervised release following release from incarceration.
Under Section 561.1, the supervised release provisions apply to any person convicted, on or after the effective date of the act, of a sex offense as defined in La.Rev. Stat. § 15:541,[4] when the victim is under thirteen years of age. According to Section 561.3, supervised release is administered by the Department of Public Safety and Corrections, division of probation and parole, and supervised release officers have the powers and duties of parole officers. Section 561.4 directs the trial court at sentencing as well as the Department of Public Safety and Corrections to inform the offender he will be placed on supervised release and of the conditions of supervision. Section 561.5 sets forth the conditions of supervised release:
(1) Report immediately to the division of probation and parole office, Department of Public Safety and Corrections, which is listed on the face of the certificate of supervised release.
(2) Establish a schedule of a minimum of one meeting per month with his supervised release officer to provide the officer with his current address, electronic mail address or addresses, instant message name or names, date of birth, place of employment, and verification of compliance with all registration and notification requirements of a sex offender as required by law.
(3) Be subject to periodic visits with his supervising officers without prior notice.
(4) Abide by any curfew set by his supervising officers.
(5) Refrain from using or possessing any controlled dangerous substance or alcoholic beverage and submit, at his own expense, to screening, evaluation, and treatment for controlled dangerous substances or alcohol abuse as directed by his supervising officers.
(6) Refrain from purchasing or possessing any pornographic or sexually explicit materials. “Pornographic or sexually explicit materials” means any paper, magazine, book, newspaper, periodical, pamphlet, composition, publication, photograph, drawing, picture, |sposter, motion picture film, video tape, figure, phonograph record, album, cassette, wire or tape recording, compact disc, digital versatile disc,' digital video disc, or any other form of visual technology or other similar tangible work or thing which is devoted to or principally consists of descriptions or depictions of illicit sex or sexual immorality, the graphic depiction of sex, including but not limited to the visual depiction of sexual activity or nudity, ultimate sexual acts, normal or perverted, actual, simulated, or animated, whether between human beings, animals, or an animal and a human being.
(7) Report to the supervised release officer when directed to do so.
(8) Not associate with persons known to be engaged in criminal activities or with persons known to have been convicted of a felony without written permission of his supervised release officer.
(9) In all respects, conduct himself honorably, work diligently at a lawful occupation, and support his dependents, if any, to the best of his ability.
(10) Promptly and truthfully answer all inquiries directed to him by the supervised release officer.
*346 (11) Live and remain at liberty and refrain from engaging in any type of criminal conduct.
(12) Not have in his possession or control any firearms or dangerous weapons.
(13) Submit himself to available medical, psychiatric, or mental health examination and treatment for persons convicted of sex offenses when deemed appropriate and ordered to do so by the supervised release officer.
(14) Defray the cost, or any portion thereof, of his supervised release by making payments to the Department of Public Safety and Corrections in a sum and manner determined by the Department of Public Safety and Corrections, based upon his ability to pay.
(15) Submit a residence plan for approval by the supervised release officer.
(16) Submit himself or herself to continued supervision, either in person or through remote monitoring, of all of the following Internet related activities:
(a) The person’s incoming and outgoing electronic mail and other Internet-based communications.
(b) The person’s history of websites visited and the content accessed.
laic) The periodic unannounced inspection of the contents of the person’s computer or any other computerized device or portable media device and the removal of such information, computer, computer device or portable media device to conduct a more thorough inspection.
(17) Comply with such other specific conditions as are appropriate, stated directly, and without ambiguity so as to be understandable to a reasonable man.[5]
Section 561.6 directs the Department of Public Safety and Corrections to adopt rules necessary to implement these provisions, and Section 561.7 provides the penalties for failing to comply with the conditions of supervised release, which include fines up to three thousand dollars and imprisonment with hard labor from two to twenty years “without benefit.”
Of particular relevance herein, Section 561.2 governs the commencement and duration of supervision. As originally enacted in 2006, Section 561.2 provided:
A. Except as provided for in R.S. 15:561.3, a person convicted on or after August 15, 2006, of a sex offense as defined in R.S. 15:541(14.1) when the victim is under the age of thirteen years shall be placed upon supervised release as provided for by this Chapter whenever he is released from the custody of the Department of Public Safety and Corrections upon expiration of his sentence.
B. Any person placed on supervised release pursuant to the provisions of this Section shall be on supervised release for a period of five years from the date of release from incarceration.
By Acts 2008, No. 672, § 2, effective August 15, 2008, the Legislature increased the period of supervision from five years to life. This provision was again amended by Acts 2009, No. 205, § 1, effective August 15, 2009, to allow a person placed on supervised release to petition the sentencing court for termination of supervision. In its present form, La.Rev.Stat. § 15:561.2 now provides:
| )0A. A person convicted on or after August 15, 2006, of a sex offense as defined in R.S. 15:541 when the victim is under the age of thirteen years shall be placed upon supervised release as pro *347 vided for by this Chapter whenever he is released from the custody of the Department of Public Safety and Corrections upon expiration of his sentence.
B. Any person placed on supervised release pursuant to the provisions of this Section shall be on supervised release for life from the date of release from incarceration. Notwithstanding any other provision of law to the contrary, any person who was placed upon supervised release pursuant to the provisions of this Section, may petition the sentencing court for a termination of the supervision.
The present defendant committed the charged offense at some point between October 7, 2002, and May 15, 2006. He pled guilty on May 19, 2008, and was sentenced on May 29, 2008. The question this Court must resolve then is whether the amendment, which increased the five-year period to life and became effective about three months after defendant pled guilty, can be applied to him retroactively. The answer lies within the relevant constitutional provisions as interpreted and applied by the courts. Thus, our constitutional analysis begins, as always, with the constitutional provisions themselves.
Article I, § 9 of the United States Constitution forbids Congress from passing any ex post facto law, providing: “No Bill of Attainder or ex post facto Law shall be passed.” U.S. Const, art. I, § 9, cl. 3. Article I, § 10 similarly forbids the states from doing so: “No State shall enter into any Treaty, Alliance, or Confederation; grant Letters of Marque and Reprisal; coin Money; emit Bills of Credit; make any Thing but gold and silver Coin a Tender in Payment of Debts; pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts, or grant any Title of Nobility.” U.S. Const, art. I, § 10, cl. 1. Likewise, La. Const. art. I, § 28, patterned on the federal provisions, also prohibits the enactment of any ex post facto law, stating: “No bill of attainder, ex post facto law, or law impairing the obligation of contracts shall be enacted.”
_]_yAlthough “ex post facto” was left undefined, the seminal case of Calder v. Bull, 3 U.S. (3 Dall.) 386, 1 L.Ed. 648 (1798), interpreted it as a legal term of art with an established meaning at the time of the framing of the Constitution and outlined four categories of ex post facto laws:
1st. Every law that makes an action, done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2nd. Every law that aggravates a crime, or makes it greater than it was, when committed. 3rd. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender.
Calder, 3 U.S. (3 Dall.) at 390-91. This formulation was later summarized by the Court as follows:
It is settled, by decisions of this court so well known that their citation may be dispensed with, that any statute which punishes as a crime an act previously committed, which was innocent when done, which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at the time when the act was committed, is prohibited as ex post facto. The constitutional prohibition and the judicial interpretation of it rest upon the notion that laws, whatever their form, which purport to make inno *348 cent acts criminal after the event, or to aggravate an offense, are harsh and oppressive, and that the criminal quality attributable to an act, either by the legal definition of the offense or by the nature or amount of the punishment imposed for its commission, should not be altered by legislative enactment, after the fact, to the disadvantage of the accused.
Beazell v. Ohio, 269 U.S. 167, 169-170, 46 S.Ct. 68, 68-69, 70 L.Ed. 216 (1925).
Then, in Collins v. Youngblood, 497 U.S. 37, 45-50, 110 S.Ct. 2715, 2720-24, 111 L.Ed.2d 30 (1990), the Supreme Court disavowed prior jurisprudence that had distinguished between procedural and substantive changes to criminal laws, which the court perceived as causing confusion in the lower courts and enlarging the meaning of “ex post facto law” beyond what was consistent with the understanding of the term when the Constitution was adopted. This Court mirrored 11?the federal contraction in interpreting “ex post facto” and the return to the Colder categories in State ex rel. Olivieri v. State, 00-0172, p. 15-16 (La.2/21/01), 779 So.2d 735, 744 (noting Louisiana’s constitutional prohibition against the enactment of ex post facto laws is not only patterned after the United States Constitution, but mandated by it), cert, denied, Olivieri v. Louisiana, 533 U.S. 936, 121 S.Ct. 2566, 150 L.Ed.2d 730 (2001) and Hutchinson v. Louisiana, 534 U.S. 892, 122 S.Ct. 208, 151 L.Ed.2d 148 (2001).
In Smith v. Doe, which was examined by the court below, the Supreme Court considered whether the registration requirement imposed by Alaska’s Sex Offender Registration Act constituted a retroactive punishment prohibited by Caldef s third category when applied to persons convicted before the passage of the act. At the outset, the Doe court recognized the analytical framework was a well-established and potentially two-part inquiry:
This is the first time we have considered a claim that a sex offender registration and notification law constitutes retroactive punishment forbidden by the Ex Post Facto Clause. The framework for our inquiry, however, is well established. We must “ascertain whether the legislature meant the statute to establish ‘civil’ proceedings.” If the intention of the legislature was to impose punishment, that ends the inquiry. If, however, the intention was to enact a regulatory scheme that is civil and nonpunitive, we must further examine whether the statutory scheme is “ ‘so punitive either in purpose or effect as to negate [the State’s] intention’ to deem it ‘civil.’ ” Because we “ordinarily defer to the legislature’s stated intent,” “ ‘only the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty.”
Doe, 538 U.S. at 92, 123 S.Ct. at 1146-47 (citations omitted). The Court further noted the first step in the inquiry is a question of statutory construction to ascertain the legislative objective:
Whether a statutory scheme is civil or criminal “is first of all a question of statutory construction.” We consider the statute’s text and its structure to determine the legislative objective. A conclusion that the legislature intended to punish would satisfy an ex post facto | ^challenge without further inquiry into its effects, so considerable deference must be accorded to the intent as the legislature has stated it.
The courts “must first ask whether the legislature, in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other.” Here, the Alaska *349 Legislature expressed the objective of the law in the statutory text itself. The legislature found that “sex offenders pose a high risk of reoffending,” and identified “protecting the public from sex offenders” as the “primary governmental interest” of the law. The legislature further determined that “release of certain information about sex offenders to public agencies and the general public will assist in protecting the public safety.” As we observed in [Kansas v.] Hendricks, where we examined an ex post facto challenge to a postincarceration confinement of sex offenders, an imposition of restrictive measures on sex offenders adjudged to be dangerous is “a legitimate nonpunitive governmental objective and has been historically so regarded.”
Id., 538 U.S. at 92-93, 123 S.Ct. at 1147 (citations omitted). Finding nothing on the statute’s face or the procedures by which it was implemented suggested the legislature sought to impose punishment, the Court concluded the “intent of the Alaska Legislature was to create a civil, nonpunitive regime.” Id., 538 U.S. at 96, 123 S.Ct. at 1149. Therefore, the Court proceeded to the second step of the inquiry and considered the effects of the enactment;
In analyzing the effects of the Act we refer to the seven factors noted in Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168-169, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963), as a useful framework. These factors, which migrated into our ex post facto case law from double jeopardy jurisprudence, have their earlier origins in cases under the Sixth and Eighth Amendments, as well as the Bill of Attainder and the Ex Post Facto Clauses. Because the Mendoza-Martinez factors are designed to apply in various constitutional contexts, we have said they are “neither exhaustive nor dispositive,” but are “useful guideposts,” The factors most relevant to our analysis are whether, in its necessary operation, the regulatory scheme: has been regarded in our history and traditions as a punishment; imposes an affirmative disability or restraint; promotes the traditional aims of punishment; has a rational connection to a nonpunitive purpose; or is excessive with respect to this purpose.
Id., 538 U.S. at 97, 123 S.Ct. at 1149 (citations omitted). Finding sex offender registration, as enacted in Alaska, did not resemble any historically recognized 114form of punishment, imposed no punitive restraints, only indirectly resulted in disability, and was reasonably related to the danger of recidivism rather than being retributive, the Court concluded such registration was nonpunitive in effect, and so, its retroactive application did not violate the constitutional ex post facto prohibition. Id., 538 U.S. at 97-103, 123 S.Ct. at 1149-53.
Employing the well-established analytical framework utilized in Doe, our first step is to determine whether the intention of the Louisiana legislature was to impose punishment when it enacted the supervised release provisions. As noted above, the question is one of statutory interpretation. “What a legislature says in the text of a' statute is considered the best evidence of the legislative intent or will.” State v. Williams, 00-1725, p. 13 (La.11/28/01), 800 So.2d 790, 800. The pertinent legislative findings associated with the enactment of the supervised release laws at issue are set forth in La.Rev. Stat. § 15:561 reproduced above.
Although the Legislature’s comments in Section 561(A) indicate the Legislature has “enacted statutory provisions to provide some of the strictest criminal penalties for the commission of sex offenses,” this state- *350 merit is merely part of the Legislature’s description of this state’s overall policy regarding sex offenders, which admittedly includes harsh penalties, but also registration and notification provisions; the “penalties,” however, are not descriptive of the supervision provisions. In the remaining sections, the Legislature notes in Section 561(B) the high risk of recidivism for sex offenders with minor victims, describes in Sections 561(B) and (C) its interest in protecting the public from this type of recidivism as paramount and compelling, deems in Section 561(C) its interest in ensuring compliance by these offenders with the registration and notification requirements compelling, and concludes for those reasons in Section 561(D) that sex offenders will be placed on supervised release following incarceration to | ^facilitate and ensure compliance with registration and notification requirements. Thus, the Legislature explicitly states its intention that the supervision provisions are to protect the public from offenders with a particularly high risk of re-offending and to operate in conjunction with the sex offender registration and notification requirements. The explicit purpose of the provisions at issue, therefore, is civil, rather than punitive, for the protection of the public.
In Olivieri, this Court examined the legislative findings associated with Louisiana’s sex offender registration act, which provide:
A. The legislature finds that sex offenders often pose a high risk of engaging in sex offenses even after being released from incarceration or commitment and that protection of the public from sex offenders is of paramount governmental interest. The legislature further finds that local law enforcement officers’ efforts to protect their communities, conduct investigations, and quickly apprehend offenders who commit sex offenses are impaired by the lack of information available to law enforcement agencies about convicted sex offenders who live within the agency’s jurisdiction, and the penal and mental health components of our justice system are largely hidden from public view and that lack of information from either may result in failure of both systems to meet this paramount concern of public safety. Restrictive confidentiality and liability laws governing the release of information about sex offenders have reduced willingness to release information that could be appropriately released under the public disclosure laws, and have increased risks to public safety. Persons found to have committed a sex offense have a reduced expectation of privacy because of the public’s interest in public safety and in the effective operation of government. Release of information about sex offenders to public agencies, and under limited circumstances to the general public, will further the governmental interests of public safety and public scrutiny of the criminal and mental health systems so long as the information released is rationally related to the furtherance of those goals.
B. Therefore, this state’s policy is to assist local law enforcement agencies’ efforts to protect their communities by requiring sex offenders, to register with local law enforcement agencies and to require the exchange of relevant information about sex offenders to members of the general public.
11fiLa.Rev.Stat. § 15:540. After examining these findings, this Court determined the intention of the Louisiana legislature was not to impose punishment when it enacted the sex offender registration provisions:
A careful review of the subjective intent enunciated in LA. REV.STAT. ANN. § 15:540 shows that the Legisla *351 ture enacted this state’s Megan’s Laws with an avowedly non-punitive intent. It is clear that the laws were enacted to protect communities, aid police in their investigation of sex offenders, and enable quick apprehension of sex offenders. These enactments were further founded on the findings of the Legislature that this legislation was of paramount governmental interest because: (1) sex offenders pose a high risk of engaging in sex offenses, (2) sex offenders have a high incidence of recidivism, and (3) unless there was registration and community notification, sex offenders could remain hidden and thereby increase the risk to public safety. Accordingly, it is apparent that the intent of the Legislature was to alert the public for the purpose of public safety, a remedial intent, not to punish convicted sex offenders.
Olivieri, 00-0172 at pp. 19-20, 779 So.2d at 747.
Considering the supervision provisions at issue were enacted with similar concern for the high risk for recidivism and supervision is declared to operate in conjunction with registration and notification, we find the intent enunciated by the Legislature in La.Rev.Stat. § 15:561 clearly passes scrutiny under the first step of the analysis.
Proceeding to the second step of the analysis, we must now determine whether the provision intended as civil is sufficiently punitive in its effects as to constitute punishment. In making this determination, courts have used the seven-factor test recited in Kennedy v. Mendoza-Martinez, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963):
Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of scienter, whether its operation will promote the traditional aims of punishment-retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned are all relevant to the |17inquiry, and may often point in differing directions. Absent conclusive evidence of congressional intent as to the penal nature of a statute, these factors must be considered in relation to the statute on its face.
Id., 372 U.S. at 168-169, 83 S.Ct. 567-568 (footnotes omitted). These factors, however, are neither exhaustive nor dispositive; they only provide a framework for the analysis. Doe, 538 U.S. at 97, 123 S.Ct. at 1149. Moreover, while the Supreme Court has not explained the relative weight to be afforded each factor, it has recognized that no one factor is determinative as they “often point in differing directions” and has even cautioned that only the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty. Hudson v. United States, 522 U.S. 93, 100-01, 118 S.Ct. 488, 493-94, 139 L.Ed.2d 450 (1997) (quoting Kennedy v. Mendoza-Martinez, 372 U.S. 144, 169, 83 S.Ct. 554, 568, 9 L.Ed.2d 644 (1963)); see also, Kansas v. Hendricks, 521 U.S. 346, 361, 117 S.Ct. 2072, 2082, 138 L.Ed.2d 501 (1997). Ever conscious of these instructions, we examine each factor to ascertain its relevance herein.
Under the first factor, when determining whether a law subjects those within its purview to an “affirmative disability or restraint,” Mendoza-Martinez, 372 U.S. at 168, 83 S.Ct. at 567, courts inquire “how the effects of the Act are felt by those subject to it. If the disability or restraint is minor and indirect, its effects are unlike *352 ly to be punitive.” Doe, 538 U.S. at 99-100, 123 S.Ct. at 1151. Here, the State and defendant dispute to what extent the supervision affirmatively restrains or disables defendant.
On one hand, the State characterizes the supervision imposed by these provisions as minimal and not substantially interfering with an offender’s liberties. The State further compares the supervised release provisions to the sex offender registration and notification provisions, La.Rev.Stat. §§ 15:540-542.1.4, see 18Olivieri, 00-0172 at pp. 24-25, 779 So.2d at 749 (finding provisions enacted with a nonpunitive intent), and the Sex Offender Assessment Panel framework (SOAP), La.Rev.Stat. §§ 15:560-560.4, see State v. Golston, 10-2804, p. 23 (La.7/1/11), 67 So.3d 452, 467 (finding scheme regulatory, rather than criminal, for those sex offenders classified as sexually violent predators or child sexual predators). On the other hand, defendant disputes the State’s characterization of the supervision as minimal and emphasizes that, under the conditions imposed on him, he must submit to unannounced searches, his ability to travel is restricted, his choice of residence must be approved, he is prohibited from any contact with his own children, he must obey a curfew, and he may not consume any alcohol. These conditions, he contends, are more restrictive than sex offender registry and notification requirements and that, in contrast with the SOAP framework, he is not afforded an opportunity to assess his degree of rehabilitation or the risk of recidivism.
In the second factor, which in this case is factually intertwined with the first, a court will determine “whether [the sanction] has historically been regarded as punishment.” Mendoza-Martinez, 372 U.S. at 168, 83 S.Ct. at 567. As the defendant asserts and the appellate court found, the conditions of release impose a type of supervision that is traditionally viewed as punitive and mirror the conditions imposed on probationers, parolees, and persons in home incarceration. See, e.g., Griffin v. Wisconsin, 483 U.S. 868, 874, 107 S.Ct. 3164, 3168, 97 L.Ed.2d 709 (1987) (“Probation, like incarceration, is ‘a form of criminal sanction imposed by a court upon an offender after verdict, finding, or plea of guilty.’ ”). The State, in rebuttal, emphasizes the key differences between probation and supervised release, namely: (1) supervised release is a collateral rather than a direct consequence of a conviction, and (2) a violation of such release is punishable as a 119criminal offense on its own, not as an offshoot of the original conviction. However, under similar circumstances, one court found “the fact that the [Indiana Sex Offender Registration Act’s] reporting provisions are comparable to supervised probation or parole standing alone supports a conclusion that the second Mendoza-Martinez factor favors treating the effects of the Act as punitive when applied [retroactively].” Wallace v. State, 905 N.E.2d 371, 380-381 (Ind.2009). Thus, the first two Mendoza-Martinez factors would suggest the effect of the supervision provisions is punitive.
Under the third factor, courts consider “whether [the statute] comes into play only on a finding of scienter.” Mendoza-Martinez, 372 U.S. at 168, 83 S.Ct. at 567. If a sanction is not linked to a showing of mens rea, it is less likely to be intended as punishment. Here, the supervision provisions apply to any person convicted, on or after the effective date of the act, of a sex offense as defined in La.Rev.Stat. § 15:541.[6] However, because the supervi *353 sion requirements are premised upon the 12oprevious commission of a serious felony-offense necessarily incorporating the element of scienter, the scienter test is generally downplayed by courts when evaluating sex offender regulations. See, e.g., Doe v. Bredesen, 507 F.3d 998, 1007 (6th Cir.2007) (“whether the Acts came into play only upon a finding of scienter — [is] not particularly germane [and does] not alter the conclusion that the effects of the Registration Act and Monitoring Act are not so punitive as to negate the State’s clearly expressed intent to create a civil regulatory scheme”), cert. denied, 555 U.S. 921, 129 S.Ct. 287, 172 L.Ed.2d 210 (2008). Therefore, this factor is of little value in the present case.
The fourth factor questions “whether [the statute’s] operation will promote the traditional aims of punishment — retribution and deterrence.” Mendoza-Martinez, 372 U.S. at 168, 83 S.Ct. at 567. Courts have found that some deterrent effect does not negate the overall remedial and regulatory nature of an act and deterrence can serve both criminal and civil goals. See, e.g., Hatton v. Bonner, 356 F.3d 955, 965 (9th Cir.2004); see also, United States v. Ursery, 518 U.S. 267, 292, 116 S.Ct. 2135, 2149, 135 L.Ed.2d 549 (1996) (“Congress may impose both a criminal and a civil sanction in respect to the same act or omission”). As the Supreme Court has often cautioned, “[t]o hold that the mere presence of a deterrent purpose renders such sanctions ‘criminal’ ... would severely undermine the Government’s ability to engage in effective regulation.” Hudson, 522 U.S. at 105, 118 S.Ct. at 496; see also Doe, 538 U.S. at 102, 123 S.Ct. at 1152. Moreover, arguably retributive aspects, such as the length of supervision, though directly related to the degree and nature of the offense, have nevertheless been found to be consistent with the regulatory objectives if reasonably related to the danger of |2irecidivism. Id. By imposing conditions of supervision on sex offenders with child victims, the provision herein is specifically designed to reduce the likelihood of future crimes and is, therefore, reasonably related to the danger of recidivism.
*354 Under the fifth factor, courts consider “whether the behavior to which [the statute] applies is already a crime.” Mendoza-Martinez, 372 U.S. at 168, 83 S.Ct. at 567. Supervision is imposed by La. Rev. Stat. §§ 15:561 et seq. only on persons convicted of enumerated sex offenses with minor victims. So, this factor, like the third, is of little weight in this case because, as the Doe court noted: “The regulatory scheme applies only to past conduct, which was, and is, a crime. This is a necessary beginning point, for recidivism is the statutory concern. The obligations the statute imposes are ... not predicated upon some present or repeated violation.” Doe, 538 U.S. at 105, 123 S.Ct. at 1154.
In the sixth factor, courts ask whether “an alternative purpose to which [the statute] may rationally be connected is assignable for it.” Mendoza-Martinez, 372 U.S. at 168-169, 83 S.Ct. at 567. This statement is generally interpreted as an inquiry into whether the statute advances a legitimate regulatory purpose. “The [statute’s] rational connection to a nonpunitive purpose is a ‘[m]ost significant’ factor in our determination that the statute’s effects are not punitive.” Doe, 538 U.S. at 102, 123 S.Ct. at 1152 (quoting United States v. Ursery, 518 U.S. 267, 290, 116 S.Ct. 2135, 2148, 135 L.Ed.2d 549 (1996)). Such a connection, however, need only be rational for “[a] statute is not deemed punitive simply because it lacks a close or perfect fit with the nonpunitive aims it seeks to advance.” Doe, 538 U.S. at 103, 123 S.Ct. at 1152. The supervision provisions at issue here clearly advance the legitimate nonpunitive purpose of enhancing public safety by providing, as the State contends, a regulatory framework to protect the public from a narrow class of offenders who are at a heightened risk for recidivism if left unsupervised.
| ^Finally, under the seventh factor, courts ask “whether [the statute] appears excessive in relation to the alternative purpose assigned.” Mendoza-Martinez, 372 U.S. at 169, 83 S.Ct. at 567. This factor often also receives great weight, but the Supreme Court has cautioned this exces-siveness inquiry “is not an exercise in determining whether the legislature has made the best choice possible to address the problem it seeks to remedy. The question is whether the regulatory means chosen are reasonable in light of the non-punitive objective.” Doe, 538 U.S. at 105, 123 S.Ct. at 1154. Doe provides strong support to conclude the supervision provisions, like the registration and notification requirements they operate in conjunction with, are reasonably related to the non-punitive purpose of protecting the public, particularly our most innocent and defenseless citizens, from an elevated rate of recidivism. Moreover, the duration of supervision herein is neither excessive nor unreasonable, especially given that “[e]m-pirical research on child molesters, for instance, has shown that, ‘[contrary to conventional wisdom, most reoffenses do not occur within the first several years after release,’ but may occur ‘as late as 20 years following release.’ ” Id. (quoting National Institute of Justice, R. Prentky, R. Knight, & A. Lee, U.S. Dept, of Justice, Child Sexual Molestation: Research Issues 14 (1997)).
Thus, with the exception of Mendoza-Martinez’s first and second factors, the considerations in the present case appear largely identical to those in Doe. We must, therefore, determine whether the outcome should be different than that in Doe and Olivieri because the Legislature has utilized a form of supervision that is generally considered to be a lenient form of punishment, ie., whether the punitive aspects constitute the “clearest proof’ sufficient to override the statute’s nonpunitive *355 purpose. This necessarily entails a weighing of the relevant Mendozu-Martinez factors, and in assigning weights, we find it helpful to compare the | ^provision at issue to electronic monitoring and residency restrictions, which have received some judicial scrutiny from our sister courts.
Although the courts appear somewhat divided on the issue of electronic monitoring, the majority of those who have considered the question have found the application of state statutes requiring electronic location monitoring of sex offenders whose crimes were committed before the statutes’ effective dates does not violate ex post facto prohibitions.[7] In such cases, of which Doe v. Bredesen is typical, the courts find significant that:
[The legislature] could rationally conclude that sex offenders present an unusually high risk of recidivism, and that stringent registration, reporting, and electronic surveillance requirements can reduce that risk and thereby protect the public without further “punishing” the offenders. Where there is such a rational connection to a nonpunitive purpose, it is not for the courts to second-guess the state legislature’s policy decision as to which measures best effectuate that purpose.
Id., 507 F.3d at 1006.[8]
Using the framework provided in Smith v. Doe, courts have also generally declined to find the retroactive application of residency restrictions to sex offenders violates prohibitions against ex post facto laws.[9] As in the electronic monitoring cases, those courts that have upheld the retroactive application of presidency restrictions generally consider the most significant Mendozu-Martinez factor to be a rational connection between the restriction and its nonpunitive purpose:
This final factor-whether the regulatory scheme has a “rational connection to a nonpunitive purpose” — is the “most significant factor” in the ex post facto analysis. Smith v. Doe, 538 U.S. at 102, 123 S.Ct. 1140. The requirement of a “rational connection” is not demanding: A “statute is not deemed punitive simply because it lacks a close or perfect fit with the nonpunitive aims it seeks to advance.” Id. at 103, 123 S.Ct. 1140. The district court found “no doubt” that *356 § 692A.2A has a purpose other than punishing sex offenders, [Doe v. Miller, 298 F.Supp.2d [844] at 870 (S.D.Iowa 2004)], and we agree. In light of the high risk of recidivism posed by sex offenders, see Smith v. Doe, 538 U.S. at 103, 123 S.Ct. 1140, the legislature reasonably could conclude that § 692A.2A would protect society by minimizing the risk of repeated sex offenses against minors.
Doe v. Miller, 405 F.3d 700, 721 (8th Cir.2005), cert. denied, 546 U.S. 1034, 126 S.Ct. 757, 163 L.Ed.2d 574 (2005).
In accord with this jurisprudence, it is clear the most significant question under the second stage of the intent/effects analysis is whether the law “while perhaps having certain punitive aspects, serve[s] important nonpunitive goals.” Russell v. Gregoire, 124 F.3d 1079, 1091 (9th Cir.1997)(quoting United States v. Ursery, 518 U.S. 267, 290, 116 S.Ct. 2135, 2148, 135 L.Ed.2d 549 (1996)), cert. denied, 523 U.S. 1007, 118 S.Ct. 1191, 140 L.Ed.2d 321 (1998). A law serving nonpunitive goals “is not punishment even though it may bear harshly upon one affected,” Flemming v. Nestor, 363 U.S. 603, 614, 80 S.Ct. 1367, 1374, 4 L.Ed.2d 1435 (1960), and here, there is no doubt La.Rev.Stat. § 15:561.2 has a purpose other than punishing sex offenders. As its findings show, our Legislature rationally concluded that sex offenders present an unusually high risk of recidivism and that registration, notification, and supervision requirements can reduce that risk and thereby protect the public without further “punishing” the offenders. Where there is such a rational connection to a nonpunitive purpose and when the | ^regulatory means are reasonable given the nonpunitive objective, it is not for us to second-guess the Legislature’s policy decision as to what measures best effectuate its purpose. Therefore, after weighing all the relevant factors, we find the supervision provisions are not “so punitive in form and effect as to render them criminal despite [the legislature’s] intent to the contrary.” Ursery, 518 U.S. at 290, 116 S.Ct. at 2148.
Further bolstering this determination, we find the conditions of supervision challenged herein are less harsh than the post-incarceration, indefinite involuntary confinement of sex offenders upheld by the Supreme Court in Kansas v. Hendricks, 521 U.S. 346, 360-69, 117 S.Ct. 2072, 2081-85, 138 L.Ed.2d 501 (1997). In that case, the Court considered, inter alia, whether the retroactive application of the Kansas Sexually Violent Predator Act, Kan. Stat. Ann. § 59-29a01 et seq. (1994), which established procedures for the civil commitment of persons who, due to a “mental abnormality” or a “personality disorder,” are likely to engage in “predatory acts of sexual violence,” was prohibited by the Ex Post Facto Clause. Hendricks, 521 U.S. at 360-69, 117 S.Ct. at 2081-85. Applying the intent/effects test, the Hendricks court found the potentially indefinite detention was nonpunitive as it was linked, not to any punitive objective, but “to the stated purposes of the commitment, namely, to hold the person until his mental abnormality no longer caused him to be a threat to others.” Id. at 363, 117 S.Ct. at 2083. The Court also emphasized such commitment was “only potentially indefinite” because it was subject to judicial review. Id. at 364, 117 S.Ct. at 2083. Significantly, we note the supervision at issue herein is likewise subject to judicial review and potential termination by the sentencing court upon petition of the offender. See La.Rev. Stat. § 15:561.2(B)(“any person ... placed on supervised release ... may petition the sentencing court for termination of the supervision”).
| ¡^Accordingly, given Doe, Hendricks, and the majority of courts that have re *357 viewed sex offender electronic monitoring and residency restrictions, we find the court of appeal erred by placing too much weight on the aspect that the Legislature has resorted to supervision, which is traditionally a lenient form of punishment, and too little weight on the strength of the connection between the supervision provisions and the Legislature’s stated goals. The appellate court’s focus was strictly on the punitive aspects of supervision, and not on the important nonpunitive goals served thereby, namely the protection of the public, particularly “our most innocent and defenseless citizens,” from the risk of recidivism. However, the statistically-proven high rate of recidivism in sex offenders with minor victims and the legitimate regulatory purpose advanced by supervision— to protect the public from this danger by working in conjunction with registration and notification requirements — far outweigh the punitive aspects of the challenged provisions. In light of the rational connection to these legitimate, nonpunitive objectives, we find the punitive aspects, which the appellate court narrowly focused upon, are not sufficient to constitute “the clearest proof [necessary] to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty.” Doe, 538 U.S. at 92, 123 S.Ct. at 1147. Accordingly, we reverse the court of appeal’s judgment and reinstate the judgment of the district court.
CONCLUSION
In conclusion, we find the appellate court placed disproportionate value under the Mendozar-Murtinez framework on the punitive aspects of supervision, which is traditionally considered to be a lenient form of punishment, and insufficient value on the rational link between the enactment at issue and the Legislature’s stated goal of protecting the public from the high risk of recidivism. |27After scrutinizing the challenged supervisory provisions as directed by the Supreme Court in Doe, we find the nonpunitive regulatory goals of public protection far outweigh the punitive aspects of supervision enacted to address the dangers of recidivism. Therefore, we find the provisions at issue here are predominantly nonpunitive in both intent and effect, and their retroactive application to this defendant does not violate the Ex Post Facto Clauses of either the United States or Louisiana Constitutions. Accordingly, after converting this appeal to an application for supervisory writ, we grant the State’s writ, reverse the judgment of the court of appeal, and reinstate the district court’s judgment.
DECREE
For the foregoing reasons, we hereby grant the State’s application for supervisory writ, reverse the judgment of the court of appeal, and reinstate the district court’s judgment.
WRIT GRANTED; JUDGMENT OF THE COURT OF APPEAL REVERSED; JUDGMENT OF THE DISTRICT COURT REINSTATED.

. Defendant was also sentenced to serve an additional six months for contempt after he failed to return for sentencing when the district court accepted his plea, but allowed him a day to get his affairs in order. This sentence was later amended to ninety days with credit for time served.

. At that hearing, defendant had not yet asserted his Ex Post Facto claim. Primarily, defendant contended the prohibition of any contact with his own minor children was not required by the statute, but was imposed as a special condition by the Department of Probation and Parole, and he asked this condition be eliminated so he could live with his minor children and their mother.

. The appellate court declined to consider defendant’s claim that his parental rights were terminated without due process because it was not ruled on by the district court.

. La.Rev.Stat. § 15:541 provides the definitions for the provisions governing registration of sex offenders, sexually violent predators, and child predators. "Sex offense” is presently defined in Subsection (24)(a), but this provision is frequently amended and restructured. See infra, note 6.

. Those provisions pertaining to internet and electronic mail were added by Acts 2008, No. 672, § 2, effective August 15, 2008, as part of a series of amendments to provide for child internet safety.

. Section 541(24)(a) presently defines sex offense as follows:
"Sex offense” means deferred adjudication, adjudication withheld, or conviction *353 for the perpetration or attempted perpetration of or conspiracy to commit human trafficking when prosecuted under the provisions of R.S. 14:46.2(B)(2) or (3), R.S. 14:46.3 (trafficking of children for sexual purposes), R.S. 14:78 (incest), R.S. 14:78.1 (aggravated incest), R.S. 14:89 (crime against nature), R.S. 14:89.1 (aggravated crime against nature), R.S. 14:80 (felony carnal knowledge of a juvenile), R.S. 14:81 (indecent behavior with juveniles), R.S.14:81.1 (pornography involving juveniles), R.S. 14:81.2 (molestation of a juvenile), R.S. 14:81.3 (computer-aided solicitation of a minor), R.S. 14:81.4 (prohibited sexual conduct between an educator and student), R.S. 14:92(A)(7) (contributing to the delinquency of juveniles), R.S. 14:93.5 (sexual battery of the infirm), R.S. 14:106(A)(5) (obscenity by solicitation of a person under the age of seventeen), R.S. 14:283 (video voyeurism), R.S. 14:41 (rape), R.S. 14:42 (aggravated rape), R.S. 14:42.1 (forcible rape), R.S. 14:43 (simple rape), R.S. 14:43.1 (sexual battery), R.S. 14:43.2 (second degree sexual battery), R.S. 14:43.3 (oral sexual battery), R.S. 14:43.5 (intentional exposure to AIDS virus), or a second or subsequent conviction of R.S. 14:283.1 (voyeurism), committed on or after June 18, 1992, or committed prior to June 18, 1992, if the person, as a result of the offense, is under the custody of the Department of Public Safety and Corrections on or after June 18, 1992. A conviction for any offense provided in this definition includes a conviction for the offense under the laws of another state, or military, territorial, foreign, tribal, or federal law which is equivalent to an offense provided for in this Chapter, unless the tribal court or foreign conviction was not obtained with sufficient safeguards for fundamental fairness and due process for the accused as provided by the federal guidelines adopted pursuant to the Adam Walsh Child Protection and Safety Act of 2006.

. Doe v. Bredesen, 507 F.3d 998 (6th Cir.2007); Hassett v. State, 12 A.3d 1154 (Del.2011) (unpub’d); State v. Bare, 197 N.C.App. 461, 677 S.E.2d 518 (2009), review denied, 364 N.C. 436, 702 S.E.2d 492 (2010); Neville v. Walker, 376 Ill.App.3d 1115, 316 Ill.Dec. 109, 878 N.E.2d 831 (2007), appeal denied, 229 Ill.2d 628, 325 Ill.Dec. 6, 897 N.E.2d 254 (2008).

. The opposite result was reached in Massachusetts and Florida. Commonwealth v. Cory, 454 Mass. 559, 911 N.E.2d 187 (2009); Harder v. State, 14 So.3d 1291 (Fla.Dist.Ct.App.2009). While Florida’s analysis is brief and more based in procedure, the analysis in Massachusetts emphasizes that physical attachment of the monitoring device and continual surveillance is more intrusive and burdensome than the registration and notification requirements.

.See, e.g., Weems v. Little Rock Police Dept., 453 F.3d 1010, 1017 (8th Cir.2006), cert. denied, 550 U.S. 917, 127 S.Ct. 2128, 167 L.Ed.2d 862 (2007); State v. Seering, 701 N.W.2d 655, 669 (Iowa 2005); People v. Leroy, 541, 357 Ill.App.3d 530, 293 Ill.Dec. 459, 828 N.E.2d 769, 782 (2005), appeal denied, 216 Ill.2d 713, 298 Ill.Dec. 385, 839 N.E.2d 1032 (2005); but see Commonwealth v. Baker, 295 S.W.3d 437 (Ky.2009) (finding that the retroactive application of sex offender residency restrictions violated ex post facto prohibitions), cert. denied, - U.S. -, 130 S.Ct. 1738, 176 L.Ed.2d 213 (2010); Elwell v. Township of Lower, 2006 WL 3797974, at *17 (N.J.Super.Ct.Law Div.2006) (unpub'd) (finding that a township ordinance creating sex offender prohibition zones is preempted by state law, runs afoul of ex post facto prohibitions, and is void for vagueness).